GOODWILL ADVERTISING COMPANY *vs.* ELMWOOD

AMUSEMENT CORPORATION.

JUNE 27, 1957.

PRESENT: Flynn, C. J., Condon, Roberts, Andrews and Paolino, JJ.

PAOLINO, J. This action in assumpsit was tried before a justice of the superior court sitting with a jury. After completion of the testimony by both parties the trial justice granted the defendant's motion for a directed verdict on the ground that the contract between the plaintiff and the defendant was in violation of the lottery laws of Rhode Island and therefore null, void and unenforceable. The case is before us on the plaintiff's single exception to the granting of such motion.

We are concerned here only with the first count of plaintiff's declaration wherein it sets forth a claim based on an express contract for royalties and license fees for the licensing of "Bank Night" in defendant's theatre.

The plaintiff is a Massachusetts corporation engaged in the promotion of a plan known as "Bank Night." The defendant, a Rhode Island corporation, operates the Hollywood Theatre in the town of East Providence. On March 7, 1941 a written contract was executed by the parties wherein plaintiff licensed defendant to operate bank night in said theatre in accordance with the terms of the contract. The contract was to begin on Wednesday, March 26, 1941, and, in the absence of a written termination, was to run for five years. It was also provided that if the operation was continued thereafter the agreement would be renewed for additional periods. The plan was to be used every Wed-

nesday night in its theatre, and defendant agreed to pay plaintiff $10 for each occasion on which it used such plan.

Under the terms of the contract the plaintiff agreed to supply defendant with certain paraphernalia for conducting bank night, including registration sheets, qualification cards, control cards, wire drum, punch, file cabinet, film trailers and other supplies. It was further provided that the plan was to be operated in accordance with the provisions of a "Special Notice" and "Bank Night Instructions" printed on the reverse side of the contract.

The special notice provides that bank night is an advertising plan to stimulate public interest in the motion picture industry and in the particular theatre, and that it is not intended to provide a means whereby the theatre can give a prize to its patrons. Such notice also provides among other things that all persons desiring to participate in bank night drawings must be allowed to register without payment of an admission fee or any other consideration; that the name of the winner must be announced outside and inside the theatre; and that if the winner is outside the theatre he must be permitted to enter and claim the bank account without any admission fee. The contract also requires that the theatre must give public notice of these requirements.

The bank night instructions, referred to above, provided for a register book, to be available in the lobby, in which the public at large might register. The registrations were then transferred from this book to two sets of cards, one arranged alphabetically and the other numerically. The alphabetical card had at its lower right corner a perforated portion containing the registrant's number. This portion was to be detached and placed in a coupon box containing all the other numbers which had been deposited.

At the drawing made each Wednesday on the stage of the theatre one of the numbers would be drawn out by a person picked at random from the audience. This number

would then be called out by the manager of the theatre and at the same time the numerical index cards would be inspected in the files which were on the stage at the time. The card with the number corresponding to that which had been drawn from the drum would show the name and address of the winner who had previously registered. A reasonable time was allowed for the winner to appear, whether such person be in or outside the theatre. If the winner did not appear within a reasonable time the bank account would be carried over and added to the regular weekly amount for the following week.

Before a winner would be paid the amount of the prize, he had to present his qualification card. A registrant would receive his weekly qualification card at the theatre when he originally registered. The card had to be signed by the registrant in ink in the presence of a theatre employee. In order to qualify, the registrant was required to present this card each week to the doorman at the theatre any time during show hours on a Wednesday up to the time of the drawing. In order to be eligible to receive the current week's award, the face of the card had to be punched with a special punch used by the doorman. The card states on its face: "Participation in Bank Night is Free, but you must first register, then qualify this card each week, to be eligible to receive the current week's award."

The printed provisions appearing on the reverse side of the qualification card also provided that the winner's name would be announced between 9 and 10 p.m. inside and outside the theatre and posted in the box office; that to be eligible to receive the award the winner must present his card properly qualified to the manager any time before a specified hour on the day of the drawing; that $25 or more in cash would be offered free at a drawing every Wednesday evening; that if the award was not claimed within the specified time it would be carried over to the following week; and that $25 would be added each week until a qualified

winner appeared. The card also provided that upon signing such card the registrant agreed to abide by all the rules and that the decision of the judges would be final.

At the trial, Mr. Roy E. Heffner, president of the plaintiff corporation, testified that defendant had operated bank night weekly from March 26, 1941 up to December 22, 1949, the date of the issuance of plaintiff's writ; that defendant had made no payments after March 1943; and that the balance due plaintiff under the contract was $3,151.80. The evidence also shows that sometime in 1948 or 1949 plaintiff was told by one of defendant's officers that ·defendant was not going to pay the alleged indebtedness because bank night was a lottery. In substance plaintiff's evidence was that the contract as written and executed neither required nor contemplated the payment of consideration of any kind from those participating in the drawing and was therefore not a lottery.

On the contrary defendant's evidence was in substance that it did not operate bank night in accordance with the provisions of said contract; that only paying patrons of the theatre took part in the drawing; that the winner had to be in the theatre or in the lobby at the time of the drawing; that the name of the winner was never announced outside the theatre, except that if there were patrons in the lobby the winner's name would be called out there; that defendant would only wait two or three minutes after the winner's name was announced; and that if the winner did not come forward, the amount would be added to the following week's award. The defendant's manager also testified that the drawing took place on the stage between 8 and 8:30 p.m. and that the name of the winner was never posted.

After completion of testimony for both plaintiff and defendant the trial justice granted defendant's motion for a directed verdict on the ground that the contract contemplated a lottery in violation of general laws 1938, chapter

612, §1, and therefore being intrinsically illegal was null and void and hence unenforceable.

The plaintiff, however, contends that the contract in question would be illegal *only* if it requires or contemplates, on its face, the payment of a pecuniary consideration by any of the participants in bank night; that whether or not it requires such payment is a question of fact; and that to prove this defendant would have to show that the contract on its face calls for or contemplates such payment.

The pertinent provisions of chap. 612 are as follows:

"§ 1. Every person who shall, directly or indirectly, set up, put forth, carry on, promote or draw, publicly or privately, any lottery * * * for the purpose of exposing, setting for sale or disposing of any money * * * shall be deemed guilty of a misdemeanor and shall be imprisoned not exceeding 2 years or be fined not exceeding $2,000.00."

"§ 3. All notes, obligations, securities or promises whatsoever, given for the purchase of any lottery ticket or certificate, lottery policy, or of any document or paper taken or received for the purpose of enabling others to sell or dispose of lottery tickets or lottery policies, shall be null and void."

It is well established that three elements must be present in order to constitute a lottery within the meaning of that word as used in the criminal statutes. These are a prize, distribution by chance, and a consideration having a pecuniary value. *State* v. *Big Chief Corp.*, 64 R. I. 448, 453. The plaintiff concedes that the plan contemplated by the instant contract contains the elements of *prize* and *chance*. However, it argues that the contract does not, on its face, call for the payment of a pecuniary consideration and therefore is not intrinsically illegal. The *Big Chief Corp.* case is not in point on the issues now before us. That case involved a criminal indictment and not a contract as here. In that case, which required proof of guilt beyond a reasonable doubt, we held that on the evidence before him the trial justice was not justified in finding that anyone had in fact

paid a pecuniary consideration for the purpose of participating in bank night.

In the instant case, on the question of the illegality of the contract itself, the test should be whether or not the contract as written provides or contemplates that some of those who patronize defendant's theatre by paying for admission do so in whole or in part for the purpose of participating in bank night for the chance of winning a prize. The contract itself expressly states that such participation is to be free of charge and those desiring to participate therein are not to be required to pay any pecuniary consideration for the chance to qualify and be eligible to take part in the drawing. Lacking, as it does, one of the essential elements necessary to constitute a lottery, namely, the requirement of the payment of a pecuniary consideration, we cannot say as a matter of law that the contract is intrinsically illegal. In our opinion the trial justice erred in directing a verdict for defendant on this ground. *Heffner* v. *Myshrall,* 315 Mass. 687.

The question remains whether the trial justice erred in directing a verdict for defendant on all the evidence before him. The contract not being intrinsically illegal, the burden was on defendant to show by evidence that it was unlawful, *Heffner* v. *Myshrall, supra,* or that plaintiff was not entitled to recover under the contract because of failure on its part to perform the contract according to the terms thereof.

The plaintiff's evidence was substantially to the effect that it had carried out its agreements under the contract but that defendant had refused to make the payments it had agreed to make thereunder. On the other hand, defendant's evidence was in substance that it had not operated bank night in accordance with the provisions of the contract and that, for the most part, only paying patrons could participate in bank night as carried on by defendant. In brief, the defendant's evidence amounted to an admis-

sion that it had been conducting an illegal lottery in violation of chap. 612, §1. However, there is no credible evidence that plaintiff knew of, or was a party to, defendant's alleged method of operating the plan contrary to the terms of the contract.

In our opinion the ultimate questions of fact were whether or not defendant's patrons were actually required to purchase admission tickets to the theatre in order to qualify as participants in bank night and, if so, whether or not the contract in fact contemplated such purchases, or whether or not plaintiff knew or approved of the plan to require such purchases notwithstanding the express terms of the contract to the contrary. If the plaintiff had performed its agreements under the terms of the contract, it would be inequitable to deprive it of the benefits thereof merely because defendant failed to do so.

On the evidence there were clearly questions of fact for the jury whether defendant's evidence satisfactorily explained the prima facie case made out against it by plaintiff. It was for the jury to decide from the evidence and any reasonable inferences therefrom whether or not there was any arrangement entered into by these parties in connection with or aside from the contract that contemplated a lottery. In so doing the jury would be entitled to pass upon the credibility of the witnesses and the weight of the evidence. The jury could have disbelieved the testimony for defendant or could have given it very little weight.

It is too well established to need citation of authority that neither the trial justice nor this court will pass upon the credibility of the witnesses or the weight of the evidence on a motion for a directed verdict. On such motion all reasonable inferences from the evidence must be drawn in favor of the adverse party and a verdict should not be directed if on any reasonable view of the evidence the jury could find in favor of that party. After a careful reading of the transcript we cannot say as a matter of law that on all the

evidence in this record the jury could not have reasonably returned a verdict favorable to the plaintiff.

The plaintiff's exception is sustained, and the case is remitted to the superior court for a new trial.

FLYNN, C. J., did not participate in the decision.

*Hinckley, Allen, Salisbury & Parsons, Joseph H. Gainer, Jr.,* for plaintiff.

*Fergus J. McOsker,* for defendant.