## In re ADVISORY OPINION TO the GOVERNOR (Casino).

### No. 2004–210–M.P.

Supreme Court of Rhode Island.

Aug. 12, 2004.

To His Excellency Donald L. Carcieri, Governor of the State of Rhode Island and Providence Plantations:

We have received from Your Excellency a letter dated July 9, 2004, in which you have requested our written advisory opinion pursuant to article 10, section 3, of the Rhode Island Constitution. In your request, you raise concerns over a recent legislative enactment dealing with a proposed casino in the Town of West Warwick. The enactment at issue, G.L.1956 chapter 9.1 of title 41, entitled "The Rhode Island Gaming Control and Revenue Act,"

(Casino Act),[1] provides comprehensive guidelines for a casino operation. The Casino Act also calls for a statewide ballot question asking the voters of this state: "Shall there be a casino in the Town of West Warwick operated by an Affiliate of Harrah's Entertainment in association with the Narragansett Indian Tribe?" (referendum question). Section 41–9.1–9. Your Excellency's request asks us: "Do the question and the legislation's establishment of a privately-operated casino violate the [Rhode Island] constitutional prohibition" on lotteries in this state except those lotteries operated by the state or those previously permitted by the General Assembly. *See* R.I. Const. art. 6, sec. 15. As we said in *Almond v. Rhode Island Lottery Commission,* 756 A.2d 186, 191 (R.I.2000), we say yet again: the General Assembly has plenary power to legislate on all matters pertaining to gambling in this state. Nevertheless, we are of the opinion that both the referendum question and the Casino Act as a whole are constitutionally defective.

## Introduction

■■■■ Before delving into our discussion of the issues raised in Your Excellency's request, we reiterate our role in delivering an advisory opinion. When issuing an advisory opinion, the justices of this Court "do not speak ex cathedra, from the chair of judgment, but only as consultors somewhat like the jurisconsults under the Roman law." *Opinion to the Governor,* 93 R.I. 262, 264, 174 A.2d 553, 554 (1961). Speaking in our individual capacities as legal experts rather than Supreme Court justices, we are unable to exercise the factfinding power of the Court. *In re Request for Advisory Opinion Regarding House*

*Bill 83–H–5640,* 472 A.2d 301, 302 (R.I. 1984). Because this opinion is not an exercise of judicial power, it is not binding and "it carries no mandate." *Opinion to the Governor,* 93 R.I. at 264, 174 A.2d at 554.

As expected, the Casino Act has proven to be politically charged. Since receiving initial approval from both houses of the General Assembly, the Casino Act met a brief death on the Governor's desk. After the Governor vetoed the legislation on July 1, 2004, the Casino Act was returned to the General Assembly for further action. Expecting his veto to be overridden and betting that the Casino Act is unconstitutional, the Governor submitted the instant request for an advisory opinion. On July 12, 2004, this Court entered an order requesting that the General Assembly notify us of any action taken with respect to the Governor's veto, setting dates for oral argument and issuing a briefing schedule. The Senate and the House overrode the veto on July 23, 2004, and July 30, 2004, respectively, and the Casino Act became law. *See* R.I. Const. art. 9, sec. 14 (providing that the General Assembly may override a Governor's veto with the approval of three-fifths of the present and voting members of each house).

The Governor filed a brief in opposition to the Casino Act. The Attorney General, on behalf of the State of Rhode Island, filed a brief indicating that the questions were premature, but, on the merits, the Casino Act was unconstitutional. The Speaker of the House of Representatives and the Senate President filed briefs defending the legislation. The Greater Providence Chamber of Commerce (Greater Providence), Lincoln Park, Inc. (Lincoln Park), Newport Grand Jai Alai, LLC, (Newport Grand), and, jointly, Harrah's

---

1. Until codified, the Casino Act may be found at P.L.2004, ch. 594 (2004—S 2338 Substitute A as Amended). Throughout this opinion, we cite the Casino Act as it will be codified at G.L.1956 chapter 9.1 of title 41.

and the Narragansett Indian Tribe, filed amicus curiae briefs. With the exception of Greater Providence, all parties and amici filed reply briefs.

Under the terms of the Casino Act, the Rhode Island Lottery Commission (Lottery Commission), the Narragansett Indian Tribe (Narragansett tribe), and Harrah's Entertainment, Inc., or an affiliate thereof (Harrah's), would enter into a "Master Contract" to create a casino in this state. *See* § 41–9.1–5(e). According to its website, Harrah's "is the world's largest casino operator." Patrons of the proposed casino would be able to try their luck at a wide variety of "[g]ambling game[s]," including

> "any game played with cards, dice, equipment or a machine, * * * including, but not limited to faro, monte, roulette, keno, bingo fan tan, twenty-one, blackjack, seven and a half, klondike, craps, poker, chuck a luck, Chinese chuck a luck (dai shu), wheel of fortune, chemin de fer, baccarat, pai gow, beat the banker, panguingui, slot machine, any banking or percentage game, or any other game or device approved by the Commission * * *." Section 41–9.1–3(17).

The beginning of the casino operation would depend on voter approval. To that end, § 41–9.1–9 of the Casino Act calls for placing the referendum question on the November 2, 2004 ballot; asking: "Shall there be a casino in the Town of West Warwick operated by an Affiliate of Harrah's Entertainment in association with the Narragansett Indian Tribe?"

## I

### The Propriety of the Request

■ We begin our discussion by considering whether it is appropriate to issue an advisory opinion at this time. Our general obligation to issue advisory opinions comes from article 10, section 3, of the Rhode Island Constitution, which provides: "[t]he judges of the supreme court shall give their written opinion upon any question of law whenever requested by the governor or by either house of the general assembly." There are, however, certain procedural hurdles that must be cleared before our duty to issue an advisory opinion arises. "We are constitutionally obligated to give advisory opinions to either House of the General Assembly only when the questions propounded concern the constitutionality of pending legislation, and to the Governor only when the questions propounded concern the constitutionality of existing statutes which require implementation by the Chief Executive." *In re Advisory Opinion (Chief Justice),* 507 A.2d 1316, 1318–19 (R.I.1986).

■ Because the General Assembly has properly overridden the Governor's veto, the Casino Act is an existing statute. Nevertheless, it is clear that executive implementation of the substantive provisions of the Casino Act hinges on voter approval of the casino question through both the local and statewide referendum processes. Unless and until such approval is obtained, the Governor has no present obligation to implement the Casino Act and we are not constitutionally *required* to issue an advisory opinion. *See In re Advisory Opinion (Chief Justice )*, 507 A.2d at 1318–19.

■ Despite certain procedural infirmities, justices of this Court have been willing to issue advisory opinions if the propounded question raises important constitutional or social questions. *See In re Advisory Opinion (Chief Justice),* 507 A.2d at 1319–20. There is no clearly defined test for determining whether an improperly presented request for our opinion will be granted. That decision has been made on a case-by-case basis in

the exercise of the justices' discretion. For example, in *In re Advisory Opinion (Chief Justice)*, the justices of this Court were presented with a procedurally flawed request for an advisory opinion about the removal of a Supreme Court Chief Justice. *Id.* Although the request was improperly presented, the justices "exercise[d] [their] discretion and waive[d] the defects" so they could address the important issues raised in the request. *Id.* at 1319. Also, in *In re Advisory Opinion to the House of Representatives (Impoundment of State Aid to Cities and Towns)*, 576 A.2d 1371, 1372 (R.I.1990), despite a procedural flaw in a request for an advisory opinion, justices of this Court issued an advisory opinion about the propriety of a former Governor's refusal to distribute more than $10 million in appropriated money. Because many municipalities adopted operating budgets and entered contracts while relying on the appropriated money, the propounded question raised questions of sufficient public importance to require an immediate answer. *Id.*

The issues raised in the Governor's request are of great public and constitutional importance. The Casino Act calls for placing the referendum question on the state-wide ballot. The Governor's question asks whether the Casino Act and its requirement that the ballot question be submitted to the voters pass constitutional muster. If, as we believe, the question and legislation are void as unconstitutional, then members of the public will waste much money, time, effort, and energy to familiarize themselves with the controversial issues that the proposed casino has raised. This confusion certainly will be intensified by the fact that the Governor and the Attorney General, two general officers of this state, expressly have taken the position that the Casino Act is constitutionally infirm. The issues surrounding a state-wide vote on a casino are especially important because, as the Casino Act acknowledges, "[t]here are socio-economic costs that expanded gaming may impose on communities and the state." Section 41–9.1–2(7).

Because we believe the question and legislation to be unconstitutional, to delay the issuance of our opinion would only postpone the inevitable. If we were to sit idly by while an unconstitutional question was submitted to the voters, only to later issue a binding decision declaring the Casino Act and the referendum question void,[2] chaos might well ensue.

2. In passing, the Governor raises a specific concern over § 41–9.1–9(f) of the Casino Act. That section provides as follows:

"Any decision or act by the general assembly, the secretary of state or the Commission in (i) phrasing or submitting the statewide question, (ii) determining whether a statement of intent is in compliance with the filing and other provisions of this chapter, or (iii) awarding the single casino license, *shall be final and binding and shall not be reviewable in any court on any grounds except corruption or fraud,* so as to promote and not hinder the economic development initiatives and matters contemplated in this chapter. Jurisdiction of any suit, action or proceeding [on the grounds of corruption or fraud] shall immediately and exclusively vest in the Superior Court, and any appeal to the Rhode Island Supreme Court shall be heard on an expedited basis; *provided, however, that no such suit, action or proceeding shall serve to enjoin (i) the question referenced in subsection (a) from being submitted by the Secretary of State to the qualified electors of the state at a general election * * * by the local board of canvassers to the qualified electors of the Town of West Warwick, (ii) the awarding and issuance of the single casino license, or (iii) any recipient of a casino license from proceeding with development or operational matters,* until a final, non-appealable decision has been rendered by a court." (Emphases added.)

In recent years, the United States Supreme Court has recognized that serious constitutional questions would arise if a statute were interpreted to preclude constitutional review of agency actions. *See Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 215 n. 20, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994); *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Not surprisingly, then, the United States Supreme Court has gone to great lengths to give a narrow construction to statutes that appear to restrict the federal judiciary's ability to hear constitutional questions. *See Webster,* 486 U.S. at 603, 108 S.Ct. 2047; *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681 n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

In that same vein, the Texas Supreme Court has taken the position that

"[w]hen the Legislature remains silent or denies a right of judicial review, administrative decisions may nevertheless be attacked in court if they adversely affect a vested property right or otherwise violate some provision of the State or Federal Constitution. * * * The right to challenge administrative actions by an original action in district court on the basis that such actions unconstitutionally deprive the plaintiff of a vested property right is a right to judicial review distinctly different from the right to judicial review given by a statute." *Continental Casualty Insurance Co. v. Functional Restoration Associates,* 19 S.W.3d 393, 404 (Tex.2000).

Applying the above cited principles, we would not interpret the Casino Act to impose any restriction on the court's ability to hear and decide constitutional claims relating to the Casino Act or actions taken under it because there is no explicit restriction to that effect.

Even if the Casino Act did contain an explicit limitation on the judiciary's right to hear constitutional claims, we believe that such an attempt would be a violation of the separation of powers doctrine—"an inherent and integral element of the republican form of government." *In re Advisory from the Governor,* 633 A.2d 664, 674 (R.I.1993).

"The twin purposes of preventing concentrations of power dangerous to liberty and of promoting governmental efficiency are served if we define a constitutional violation of the separation of powers as [1] an assumption by one branch of powers that are central or essential to the operation of a coordinate branch, [2] provided also that the assumption disrupts the coordinate branch in the performance of its duties and [3] is unnecessary to implement a legitimate policy of the Government." *Id.* at 674–75 (quoting *State v. Jacques,* 554 A.2d 193, 196 (R.I.1989)).

A central operation of the judiciary is to determine whether legislative enactments and other governmental actions are constitutionally permissible. Article 6, section 1, of the Rhode Island Constitution provides in part that "[t]his Constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void." Plainly, all laws within this state, including the Casino Act, must conform to the restrictions and limitations set out in this state's constitution. R.I. Const., art. 6, sec. 1. It has long been established that the Supreme Court is the "only * * * body that is authorized to interpret the statutes of this State with the view of determining their constitutionality." *Payne & Butler v. Providence Gas Co.,* 31 R.I. 295, 313, 77 A. 145, 153 (1910). Accordingly, it is for the judiciary alone to determine whether any enactment of the General Assembly is constitutionally repugnant.

Any attempt by the General Assembly to determine for itself whether a law is inconsistent with the constitution is an assumption of this Court's right and obligation under the constitution. This assumption of judicial power disrupts the judiciary as a whole in performing its duties, and serves no legitimate purpose in effectuating governmental policy. Consequently, to the extent that the Casino Act purports to divest the judiciary of its constitutional role, § 41–9.1–9(f) impermissibly usurps the judicial power entrusted to this Court and the trial courts by art. 10, sec. 2, of the Rhode Island Constitution.

It is clear that the General Assembly has the power to establish the jurisdiction of the courts, R.I. Const. art. 10, sec. 2; but that power is not without limits. Although the General Assembly may prescribe requirements for hearing constitutional claims (statute of limitations, venue, etc.), it may not deprive the judiciary of its inherent jurisdiction to hear and decide constitutional issues.

Although we have great regard for the General Assembly and must give great deference to it and the acts it adopts, the General Assembly, like the Supreme Court and the Governor, exists solely by virtue of the state constitution. Under the constitution, "[t]he judicial power of this state shall be vested in

By delivering our advisory opinion before the question is submitted to the voters, we give credence to this Court's recognition of the prevailing public policy in favor of finality and validity of the voting process in this state. *State ex rel. Webb v. Cianci*, 591 A.2d 1193, 1200–01 (R.I.1991). In *Cianci*, this Court described the strong preference for resolving election issues before the voters have spoken. *See id.* Although *Cianci* involved a challenge to a mayor's election to office in Providence, the overriding policy favoring pre-election resolution of issues applies equally to controversial and socially important questions concerning a casino operation in this state.

Because of the public and constitutional importance of the questions before us, we will overlook any procedural deficiencies in the Governor's request and issue an advisory opinion at this time.

## II

## Referendum Question

### A

### The Casino is a Lottery Operation

■ We now consider whether this state's constitution permits a referendum question asking: "Shall there be a casino in the Town of West Warwick operated by an Affiliate of Harrah's Entertainment in association with the Narragansett Indian Tribe?" Article 6, section 15, of the Rhode Island Constitution provides:

"All lotteries shall be prohibited in the state except lotteries operated by the state and except those previously permitted by the general assembly prior to the adoption of this section, and all shall be subject to the prescription and regulation of the general assembly."

■ To determine the prohibitive effect of art. 6, sec. 15 and the concomitant constitutionality of the referendum question, we must answer the threshold question of whether the proposed casino is a lottery subject to the restrictions of art. 6, sec. 15. In answering that question, we are guided by the principle that legislative enactments enjoy a presumption of validity and constitutionality. *Mosby v. Devine*, 851 A.2d 1031, 1045–46 (R.I.2004). "The act must stand as valid, unless we are convinced beyond a reasonable doubt, that it is contrary to a provision which is either expressly set forth in the State constitution or must, beyond a reasonable doubt, be necessarily implied from language expressly set forth therein." *In re Advisory Opinion to the House of Representatives*, 485 A.2d 550, 552 (R.I.1984) (quoting *Gorham v. Robinson*, 57 R.I. 1, 10, 186 A. 832, 838 (1936)).

■ Previous decisions of this Court make clear that the lottery prohibition outlined in art. 6, sec. 15 is expansive and should be broadly interpreted. On more than one occasion, this Court has defined the term "lottery" in Rhode Island law. *See Roberts v. Communications Investment Club of Woonsocket*, 431 A.2d 1206, 1211 (R.I.1981); *Goodwill Advertising Co. v. Elmwood Amusement Corp.*, 86 R.I. 6, 12, 133 A.2d 644, 647 (1957). "It is well settled that a 'lottery' proscribed in either a state constitution or statute is defined as a scheme or a plan having three essential elements: consideration, chance, and prize." *Roberts*, 431 A.2d at 1211. "All three elements must be present before a scheme may be termed a lottery. If one of them is absent, the scheme is not a lottery, regardless of its purpose. If all of the elements are present, the scheme is a lottery, regardless of the purpose of its sponsor." *Id.*

one supreme court." R.I. Const. art. 10, sec. 1.

To determine whether the element of chance is present in a particular scheme or plan, this Court has adopted the "dominant factor" doctrine. *Id.* Under this doctrine, a scheme is a lottery "when an element of chance dominates the distribution of prizes, even though such a distribution is affected to some degree by the exercise of skill or judgment." *Id.* The majority of jurisdictions adhere to the "dominant factor" doctrine. *See Opinion of the Justices,* 795 So.2d 630, 635–36 (Ala. 2001) (providing extensive citation to opinions applying the dominant factor doctrine).

Applying the dominant factor test, this Court has held that a "pyramid" scheme constitutes a lottery because the dominant factors affecting the success or failure of the scheme, including market saturation and availability of new participants, were beyond the control of the participants. *Roberts,* 431 A.2d at 1211–12 & n. 6. Courts of our sister states have held that a wide variety of activities constitute lotteries. *See, e.g., United States v. Marder,* 48 F.3d 564, 569 (1st Cir.1995) (video poker is considered a lottery); *State v. Nelson,* 210 Kan. 439, 502 P.2d 841, 847 (1972) (bingo and slot machines are lotteries); *State ex rel. Evans v. Brotherhood of Friends,* 41 Wash.2d 133, 247 P.2d 787, 798 (1952) ("We are firmly of the opinion that slot machines * * * are mechanical lotteries").

The Narragansett tribe and Harrah's concede that some of the casino games authorized by the Casino Act, including roulette, craps and slot machines specifically, "amount to nothing more than chance." We agree. It cannot seriously be disputed that all of these games fall squarely within the definition of a lottery. Skill and judgment play no part in roulette, craps and slot machines—their outcome depends exclusively on chance. But the list of casino games satisfying the lottery definition does not end there. Under this Court's precedent, *see Narragansett Indian Tribe of Rhode Island v. State,* 667 A.2d 280 (R.I.1995), the definition of "lottery" encompasses all the games sanctioned under § 41–9.1–3(17) of the Casino Act.

Unquestionably, the Casino Act refers to games in which one can exercise some level of skill to increase his or her likelihood of winning. At the poker table for example, an experienced gambler may "know when to hold 'em, know when to fold 'em, know when to walk away, and know when to run."[3] A seasoned blackjack player may know the appropriate situation to hit or stand based on the cards dealt around the table. But even in these games, the outcome depends heavily on the luck of the draw. *See Marder,* 48 F.3d at 569 (recognizing that, although skill may play a part in video poker games, it did not dominate); *People v. Turner,* 165 Misc.2d 222, 629 N.Y.S.2d 661, 662 (N.Y.Crim.Ct.1995) (noting that poker and blackjack are games of chance because "the outcome depends to a material degree upon the random distribution of cards"); *State v. Eisen,* 16 N.C.App. 532, 192 S.E.2d 613, 616 (1972) ("In the game of blackjack * * *, we think the element of chance clearly dominates the element of skill * * *."). As the justices of the Alabama Supreme Court opined:

> "the fundamental nature of such games is chance—a player's skill, no matter how good or bad, does not and cannot control the randomness inherent in the 'deal' of the cards. Stated another way, the skill of the player may increase the player's odds of winning but ultimately the player's skill cannot determine the outcome, regardless of the degree of

---

3. Kenny Rogers, *The Gambler* on 20 Greatest Hits (Capitol Records 1994).

skill involved. Chance, being the nature or outcome-determining factor of the game, dominates over skill." *Opinion of the Justices,* 795 So.2d at 643.

The same can be said of all games that depend on the luck of the draw, the roll of the dice or the spin of the wheel. Therefore, because chance is the predominant factor affecting all the games listed in the Casino Act, they are all forms of lotteries.

It requires no special fact-finding process to determine whether the element of chance is the dominant factor in the games authorized under the Casino Act. Although a certain level of fact-finding would be helpful to determine the exact role that skill or judgment play in a particular game, games that depend on an unpredictable and uncontrollable variable, such as the case in games involving cards and dice, are, as a matter of law, games of chance.

Moreover, the idea that the proposed casino constitutes a lottery facility was determined as a matter of law in *Narragansett Indian Tribe of Rhode Island v. State,* 667 A.2d 280 (R.I.1995). That case involved a former Governor's attempt to enter a tribal-state compact (compact), permitting "class III gaming," 25 U.S.C. § 2703(8), on tribal lands in the state.[4] It is significant that the Court referred to the proposed gaming operation as a "lottery operation and facility." *Narragansett Indian Tribe of Rhode Island,* 667 A.2d at 282. So doing, the Court recognized that casino gambling games are lotteries under the Rhode Island Constitution. Because, by constitutional mandate, the General Assembly has "exclusive authority over lotteries in this state * * *" the Governor

had no power to bind the state to the "lottery compact." *Id.*

The casino proponents contend that *Narragansett Indian Tribe* does not "hold" that a casino is a lottery operation. Although it is true that there is no explicit holding in *Narragansett Indian Tribe* that a casino is a lottery, that conclusion is inescapable. A review of the compact at issue in that case reveals that the proposed casino operation was essentially identical to the one proposed here. The Speaker of the House attempts to distinguish the two proposed casinos by pointing to the fact that the compact, unlike the Casino Act, specifically would have allowed the Narragansett tribe to conduct "any lottery game * * *." But the Court's determination that the proposed casino in *Narragansett Indian Tribe* was a "lottery operation and facility" did not hinge on that provision. Indeed, the Court did not even make reference to that, or any other, gaming provision of the compact. Thus, even without an explicit authorization to carry on lotteries, it is clear that the proposed casino in that case would have been deemed a "lottery operation and facility" based on the overall nature of the operation and the types of games to be conducted.

## B

### The Question Itself Demonstrates That the Casino is not a State–Operated Lottery Facility

 Because the referendum question, if voted on by the citizens, potentially would authorize the creation of a lottery facility, the restrictions of R.I. Const. art. 6, sec. 15 apply. Therefore, the constitutionality of the referendum question de-

---

4. Class III gaming is a catchall phrase under the Indian Gaming Regulatory Act, United States Code chapter 29 of title 25, and "means all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C.

§ 2703(8). "[I]n short, [class III gaming] includes the types of high-stakes games usually associated with Nevada-style gambling." *In re Indian Gaming Related Cases,* 331 F.3d 1094, 1097 (9th Cir.2003).

pends on: (1) whether the facility would be operated by the state or, (2) whether the General Assembly had authorized such a lottery operation before art. 6, sec. 15 was adopted. We take up the former inquiry first.

To determine who has operational control of the casino, we turn first to the referendum question itself. It asks whether there shall be a casino *"operated by an Affiliate of Harrah's Entertainment in association with the Narragansett Indian Tribe?"* Section 41–9.1–9(a). A clearer identification of the casino operator cannot be imagined. The constitution would no more support a question asking whether a private organization such as Harrah's can operate a lottery facility than a question asking whether the government may conduct unlawful searches or seizures, art. 1, sec. 6, require excessive bail, art. 1, sec. 8, or take private property for public uses without paying just compensation, art. 1, sec. 16. On its face, the referendum question is contrary to art. 6, sec. 15 and, thus, is fundamentally flawed.

## C

### The Casino Act Does Not Save the Question

■■■■ Arguing that § 41–9.1–9(a) does not mean what it says, the Speaker of the House and the President of the Senate contend that the state retains operational power over the casino by virtue of the "extensive" control over the casino delegated to the Lottery Commission. It is true that the state may delegate operational control of a lottery scheme or facility to the Lottery Commission, *Almond v. Rhode Island Lottery Commission,* 756 A.2d 186, 192 (R.I.2000), but the General Assembly has not done so through the Casino Act. Rather, pursuant to the Casino Act, the Lottery Commission would take a back

seat to Harrah's when it comes to the daily operation of the proposed casino.

■■■ The Lottery Commission's rights with respect to the casino are set forth in the Casino Act. It is well established that "when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Pezzuco Construction, Inc. v. Melrose Associates, L.P.,* 764 A.2d 174, 178 (R.I.2001) (quoting *State v. DiCicco,* 707 A.2d 251, 253 (R.I.1998)).

Section 41–9.1–4(1) of the Casino Act gives the Lottery Commission powers and duties necessary "for its purpose of *licensing, regulating and enforcing* the system of casino gaming." (Emphasis added). Section 41–9.1–5(a) of the Casino Act provides that

> "[t]he Commission shall have jurisdiction over and *shall supervise* all gaming operations governed by this chapter. The Commission shall have all powers necessary and proper to fully and effectively execute this chapter * * *." (Emphasis added.)

These powers, which are set out in §§ 41–9.1–5(a)(1) through (a)(20), include the authority to perform such tasks as "[i]nvestigate applicants * * * and grant licenses," enter the casino premises "[t]o inspect, examine, audit, impound, seize or * * * remove" the licensee's books and documents, adopt licensing standards, adopt standards for the facilities, inspecting casino premises, investigating alleged violations of the Casino Act and suspending, revoking, or restricting licenses and permits.

The plain language of §§ 41–9.1–4(1) and 41–9.1–5(a) of the Casino Act assign the Lottery Commission the responsibilities of "licensing, regulating and enforcing the system of casino gaming," and "supervis[ing] all gaming operations." Clearly

and unambiguously, the Lottery Commission would serve in a regulatory capacity. Equally clearly and unambiguously, the plain language of § 41–9.1–9(a) of the Casino Act, which provides that the proposed casino would be "operated by [Harrah's]," assigns Harrah's operational control of the proposed casino.

We emphasize that the power to operate and the power to regulate comprise two distinct types of authority. Black's Law Dictionary defines "regulate" as "to adjust by rule, method or established mode; to direct by rule or restriction; to subject to governing principles or laws." Black's Law Dictionary 1286 (6th ed.1990). The term "operate" is defined as "[t]o perform a function," and "operation" as "[e]xertion of power * * *." Id. at 1091, 1092. Thus, the use of the word "regulate" indicates the mere ability to enforce conformance with a given set of rules, the use of the word "operate" denotes control over all aspects of an organization's functioning. We also note that other courts have discussed the power to operate and the power to regulate as separate duties, thus tacitly acknowledging the distinct meanings of the two terms. See Mountain States Telephone & Telegraph Co. v. Arizona Corporation Commission, 160 Ariz. 350, 773 P.2d 455, 458 (1989) (noting, in an opinion on the regulation of telephone service providers, that "[telephone service] providers operate [telephone] services, and the [Arizona Corporation] Commission's order regulates that service."); People v. Queen, 190 Cal.App.3d 826, 235 Cal.Rptr. 601, 602 (1987) (commenting that the Harbors and Navigation Code gives port districts the power both to "operate, * * * and regulate" port facilities).

Moreover, justices of this Court previously have discussed the meaning of the word "operate." In Opinion to the Governor, 76 R.I. 365, 70 A.2d 817 (1950), this Court gave an advisory opinion on whether certain powers delegated by the General Assembly to a development agency, including the power to lease a marina constructed by the development agency, were constitutional. We said that the development agency's power to lease would allow it "to lease the entire project to some private person," and noted "the plain intention of the general assembly that the marina * * * was to be * * * operated by the development authority." Id. at 372, 70 A.2d at 820. We added that "the actual control in the operation of the project should be in the development authority * * *." Id. (emphasis added.)

Black's Law Dictionary defines "control" as "[p]ower or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee. The ability to exercise a restraining or directing influence over something." Black's Law Dictionary 329 (1990). This definition of the word "control" includes the authority not only to "regulate," but also to "manage" and "direct." Based on this definition, it is clear to us that the word "control" indicates authority over the day-to-day functioning of an enterprise. It is apparent, therefore, that in choosing the words "actual control" to describe "operated by," this Court used "operate" to indicate more than mere regulatory authority. As used in Opinion to the Governor, 76 R.I. at 372, 70 A.2d at 820, "operate" refers to the power to make decisions about all aspects of the functioning of a business enterprise. Conversely, regulatory authority is merely the power to enforce conformance with a given set of rules.

Although the Lottery Commission would be endowed with a host of powers under the Casino Act, it is clear that Harrah's would have operational control over the lottery facility. Under the Casino Act, Harrah's would make day-to-day decisions

having to do with the functioning of the proposed casino while the Lottery Commission merely would enforce the applicable regulations. Unlike proceeds generated from the sale of state lottery tickets, which must be held in trust until paid into the state lottery fund, G.L.1956 § 42–61–6, daily revenue generated at the casino would go directly to Harrah's rather than to the state. Also, unlike the relationship of Lincoln Park and Newport Grand with the Lottery Commission in the case of Video Lottery Terminals,[5] Harrah's would be acting as more than a state agent hosting games on behalf of the state. Therefore, under the Casino Act, Harrah's would have operational control of the proposed casino while the Lottery Commission would have only regulatory control. Because the delegation of operational control under the Casino Act is to a private company, this delegation is an unconstitutional divestiture of operational control over a lottery to an agency other than a state organization such as the Lottery Commission. Despite our great deference to the General Assembly, it has, in this instance, failed to assume the operational power over the casino that is required by the Rhode Island Constitution.

## D

### A Casino Previously Was Not Permitted

■ It has been argued that, even if the casino constitutes a privately operated lottery operation, it is permitted under R.I. Const. art. 6, sec. 15 because it is a lottery "previously permitted by the general assembly prior to the adoption of this section." *Id.* To support its argument that casinos fall within the "previously permit-

ted" exception to the lottery restriction, Harrah's cites G.L.1956 chapter 9 of title 41. According to Harrah's, chapter 9 of title 41 preceded the enactment of art. 6, sec. 15 and authorized privately operated casinos. We disagree.

When the Rhode Island Constitution came into effect in 1843, it created an absolute prohibition on the creation of new lotteries. This prohibition remained in effect until 1973, when the constitution was amended to allow only lotteries run by the state and lotteries previously permitted. The parties do not dispute that the General Assembly never had permitted a casino operation similar to the one proposed in the Casino Act before 1973. Thus, after 1973, the only constitutionally permissible casino such as the one at issue here would be one operated by the state. This was the state of the law when chapter 9 of title 41 was enacted in 1981 (P.L.1981, ch. 233, § 4), and remained true when the current revision of the state constitution was ratified in 1986. Because the constitution would have trumped any legislative attempt to authorize a privately operated casino in 1981, chapter 9 of title 41 cannot be construed to be a preexisting statutory authorization to create a casino such as the one proposed in the Casino Act. Consequently, the proposed casino does not fall within the "previously authorized" exception to the lottery prohibition.

We are of the opinion that the referendum question is unconstitutional because it purports to allow a lottery facility that does not fall within either of the exceptions to the lottery prohibition of art. 6, sec. 15.

■ Based on our discussion above, it is apparent that the Casino Act as a whole,

---

**5.** Lottery machines housed at these facilities are linked to a centralized computer system for auditing. G.L.1956 § 42–61.2–3(9). Additionally, the Lottery Commission has au-

thority to determine the type of video lottery games to be conducted, § 42–61.2–3(3), as well as the price to pay and the prizes to be awarded, § 42–61.2–3(4).

not only the provision containing the referendum question, is void as unconstitutional. All the provisions of the Casino Act are subsumed by the referendum question. The whole casino is dependent on voter approval of the referendum question. Because the question proposes an unconstitutional operation of a casino, the Casino Act shares its infirmity.

Although the Casino Act contains a severability clause, § 41–9.1–41, the unconstitutional portions of the Casino Act, including the referendum question authorizing an unconstitutional lottery facility, are fatal. To parse out the constitutionally repugnant portions of the Casino Act would leave the legislation in tatters. It is clear that the purpose of the Casino Act cannot be served without its unconstitutional provisions and, therefore, it should be declared invalid in its entirety. *See Bouchard v. Price,* 694 A.2d 670, 678 (R.I. 1997).

## III

### Article 6, Section 22 of the Rhode Island Constitution Must be Read Together With Article 6, Section 15.

Proponents of the Casino Act argue that R.I. Const. art. 6, sec. 22 provides a constitutional mechanism for allowing a casino such as the one proposed in the Casino Act. Article 6, section 22, entitled "Restriction of gambling," provides:

> "No act expanding the types of gambling which are permitted within the state or within any city or town therein or expanding the municipalities in which a particular form of gambling is authorized shall take effect until it has been approved by the majority of those electors voting in a statewide referendum and by the majority of those electors voting in a referendum in the municipality in which the proposed gambling would be allowed."

Casino proponents contend that section 22 is separate and distinct from section 15 and acts as a trump card, allowing the creation of a casino in spite of section 15. We disagree.

■ The provisions of R.I. Const. art. 6, sec. 22 and art. 6, sec. 15 must be read in *pari materia.* Although art. 6, sec. 22 provides for the expansion of certain types of gambling in Rhode Island, it does not repeal the lottery restriction contained in art. 6, sec. 15. A harmonious reading of these two provisions leads to the inexorable conclusion that: (1) the expansion of all forms of gambling in this state may be undertaken only after receiving approval in accordance with art. 6, sec. 22, and (2) the expansion of lotteries within this state must meet the additional requirements set forth in art. 6, sec. 15, (state operation or prior approval).

Our interpretation of these two provisions is made with an understanding of the distinction between "lottery" and the broader concept of "gambling." This distinction is highlighted by the fact that sections 15 and 22 use different terminology—sec. 15 applies to lotteries and sec. 22 applies to gambling. *See Mosby,* at 1040–41 (noting that different terms imply different meanings). Although all lotteries are a form of gambling, not all forms of gambling are lotteries. There are a number of potential gambling activities that depend primarily on skill or judgment. For example,

> "pari-mutuel betting on a horse race is not a lottery. * * * In a horse race the winner is not determined by chance alone, as the condition, speed, and endurance of the horse and the skill and management of the rider are factors affecting the result of the race. The better has the opportunity to exercise his judgment and discretion in determining the

horse on which to bet. *. * * The fact that a better cannot determine the exact amount he may win at the time he places his bet, because the odds may change during the course of betting on a race, does not make the betting a mere game of chance, since the better can exercise his reason, judgment, and discretion in selecting the horse he thinks will win. Horse racing, like foot racing, boat racing, football, and baseball, is a game of skill and judgment and not a game of chance." *Rohan v. Detroit Racing Ass'n,* 314 Mich. 326, 22 N.W.2d 433, 440 (1946).

The same can be said of betting on chess, checkers or other games depending primarily or exclusively on skill. The lawful expansion of gambling on these sorts of games is subject only to the requirements of art. 6, sec. 22.

Article 6, section 22 does not cure the constitutional defects of the proposed casino. Because the Casino Act authorizes an unconstitutional lottery, it is invalid.

### Conclusion

We wish to thank the Governor, the Attorney General, the Senate President and the Speaker of the House for their excellent briefs. We also thank the Narra-
gansett tribe and Harrah's, Greater Providence, Lincoln Park, and Newport Grand for their excellent amicus curiae briefs. Their work contributed greatly to a meaningful discussion of these issues and assisted us in rendering an advisory opinion.

For the reasons stated, we answer the first question addressed to us by the Governor, namely whether the proposed ballot question violates the constitution, in the affirmative. We also answer the second question addressed to us by the Governor, namely whether the General Assembly's establishment of the proposed casino violates the constitution, in the affirmative.

Respectfully submitted,

/s/Chief Justice Frank J. Williams

/s/Justice Paul A. Suttell

/s/Chief Justice Joseph R. Weisberger(ret.)

Justices GOLDBERG, FLANDERS and FLAHERTY did not participate.