352 A.2d 634.

JOHN JENNINGS *et al. vs.* EXETER-WEST GREENWICH REGIONAL SCHOOL DISTRICT COMMITTEE.

MARCH 1, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

PAOLINO, J. The petitioner here is the Exeter-West Greenwich Regional School District Committee (the school committee). The respondents, John Jennings and Terrence Sullivan, are parents residing within that school district. We granted certiorari to review a decision of the Board of Regents for Education ordering the school committee to provide respondents' children bus transportation to and from the private school they attend.

The respondents, who live in Exeter, decided to send their children to the Roman Catholic Monsignor Matthew F. Clarke Regional School in South Kingstown after that school voted on August 3, 1973 to expand its territory to include parishes in Exeter, North Kingstown, Charlestown and Richmond. The Clarke School had previously accepted students only from parishes in Narragansett and South Kingstown. Associate Commissioner of Education, Dr. William P. Robinson, Jr., was notified of the change, and on August 10 he sent a letter to the superintendent of the school district stating that, in his opinion, G. L. 1956 (1969 Reenactment) §16-21-2 required the school committee to provide transportation to residents of the district attending the Clarke School.

The school committee afforded the respondents' children transportation to and from the Clarke School at the beginning of the school year in September 1973. However, on September 11, the school committee notified the respondents that it would not provide transportation after September 14, 1973. Six days later Dr. Robinson again wrote to the school committee asking it to review its decision. When the school committee declined to do so,

respondents appealed to Dr. Robinson, who ordered the school committee to provide transportation to respondents' children. The Board of Regents affirmed.

## I

The school committee's first contention is that it was denied a hearing before an impartial examiner. The substance of this claim is that Dr. Robinson's letters of August 10 and September 17, advising the school committee that it was required to provide transportation to the Clarke School, indicated a bias in the controversy. We cannot agree.

Doctor Robinson did not prejudge the merits of this individual controversy. He did no more than give an opinion as to the general meaning of the statute. The United States Supreme Court has squarely held that such an opinion is not the kind of prejudgment that requires an examiner to disqualify himself. *Federal Trade Comm'n* v. *Cement Institute,* 333 U. S. 683, 68 S.Ct. 793, 92 L.Ed. 1010, *rehearing denied,* 334 U. S. 839, 68 S.Ct. 1492, 92 L.Ed. 1764 (1948).

In *Cement Institute,* members of the Federal Trade Commission, as a result of an *ex parte* investigation, had stated to Congress that they believed multiple basing point-pricing to be an illegal restraint of trade. The Court held that these statements did not disqualify the commission from later issuing a cease and desist order against the defendants' multiple basing point-pricing system. First, the Court reasoned that requiring disqualification in such circumstances would frustrate Congress's purpose in creating the commission because the members would not be able to utilize the expertise they acquired.

> "If the Commission's opinions expressed in congressionally required reports would bar its members from acting in unfair trade proceedings, it would appear that opinions expressed in the first basing point unfair

trade proceeding would similarly disqualify them from ever passing on another. (citation omitted) Thus experience acquired from their work as commissioners would be a handicap instead of an advantage." *Federal Trade Comm'n* v. *Cement Institute, supra* at 702, 68 S.Ct. at 804, 92 L.Ed. at 1035.

Second, if the commission members were disqualified, similar reasoning would mandate that judges be disqualified from hearing any case involving a question of law on which they had previously ruled or written. Clearly, such a requirement had never been imposed on the judiciary and, in the Court's view, the commissioners should not be more restricted than judges.

## II

The school committee's second contention is that the associate commissioner should not have issued his order because there was no justiciable controversy. The school committee claims that respondents had suffered no harm because at the time of their appeal they had not yet been asked to pay for replacement transportation. In essence, petitioner argues that the case was not "ripe."

Without deciding whether the "case or controversy" requirement applies with full force to appeals heard by the assistant commissioner, we hold that the case was "ripe" for adjudication. The respondents suffered harm in that they had to make arrangements with the North Kingstown school district for transportation. The respondent Sullivan had to drive his child several miles to link up with this alternative transportation. Moreover, Sullivan had been informed by the North Kingstown school district that he would be billed in some manner in the future. Sullivan was thus placed in the kind of debilitating uncertainty that the United States Supreme Court has held makes an action ripe. *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). He was forced to choose whether to transfer his child to the public schools

or risk being forced to pay in the future for the transportation costs that will continue to accrue.

## III

The school committee's third contention is that it is not required to bus the respondents under §16-21-2. That section provides:

> "In the event that any such public or private schools are consolidated, regionalized, or otherwise established to serve residents of a specific area within the state the school committee of any town shall provide such transportation for pupils attending said schools who reside within the town and within the area served by such school notwithstanding the location of the school without the limits of the town *if the pupils reside so far from the school that transportation to school is provided within the town for other pupils who reside as far from school.*" (Emphasis added.)

The school committee argues that the emphasized words fix the *maximum* distance that the school committee is required to bus private school children; that is, it is not required to bus private school students any farther than it busses public school students. Testimony before the associate commissioner indicated that respondents' children would be bussed farther than any pupil in the Exeter public school system.

The associate commissioner and the Regents, on the other hand, interpreted the quoted language to mean that the school committee must bus private school students regardless of the distance, provided they live at least as far from their school as the *minimum* distance that public school students are bussed.

The language itself is susceptible of either interpretation. However, an examination of the statutory history leads us to conclude that the assoociate commissioner's interpretation is the correct one.

Prior to 1971, §§16-21-1 and 16-21-2 read as follows:

"The school committee of any town shall provide suitable transportation to and from school for pupils attending public schools of elementary and high school grades *who reside so far from any public school as to make their regular attendance at school impracticable* and for any pupil whose regular attendance would otherwise be impracticable on account of physical disability or infirmity." (Emphasis added.)

"The school committee of any town shall provide for pupils attending private schools of elementary and high school grades, except such schools as are operated for profit, the same rights and privileges as to transportation to and from schools as are provided for pupils attending public schools."

Section 16-21-1 clearly established only a *minimum* limit, the purpose of the limit being simply that students should be bussed to public schools only if they live too far to be able to walk there easily. Section 16-21-2 merely granted identical benefits to private school students, thereby incorporating the minimum distance concept. In *Chaves* v. *School Committee,* 100 R. I. 140, 211 A.2d 639 (1965), this court held that §16-21-2 did not require school committees to bus residents to private schools outside the public school district. We think it clear that when the Legislature passed the present sections, which require bussing to certain public and private schools outside the public school district, it was responding specifically to our holding in *Chaves,* while retaining the minimum distance concept of the former version.

We believe the associate commissioner's interpretation is more persuasive even apart from the legislative history. The *minimum* distance concept is consistent with the statutory purpose of providing transportation for students attending private schools within and without the public school district. Under the *minimum* distance interpretation, all students who live too far to walk are provided

bus transportation. On the other hand, the *maximum* distance public school students are bussed bears no relationship whatever to the need of private school students. The school committee's interpretation would yield highly arbitrary results. Student A might be bussed the entire distance to school, while student B, attending the same private school and living no farther away, might be transported only part way because his school district does not bus public school students as far as A's district does. We do not think the words in question were adopted to place an outer limit on the distance public school committees would be required to bus private school students. Rather, we think the Legislature thought that practical limits would be fixed by requiring bussing only within the "districts" of private schools established to serve specific geographical areas.

## IV

The school committee's next contention is that §16-21-2 delegates legislative power to a private corporation in violation of art. IV, §2, of the Rhode Island Constitution. Section 16-21-2 requires every public school district to bus children living within its boundaries to any "* * * private schools [that] are consolidated, regionalized, or otherwise established to serve residents of a specific area within the state * * *." The statute does not limit the duty of the public school districts to transport students only within those private school "districts" in existence when the bill was enacted. Thus, petitioner argues, private schools have the power to determine how far the public school districts will be required to bus private school students and, consequently, how much the public school districts will be required to spend for this purpose.

It is well established that the nondelegation doctrine prohibits only unreasonable delegations of legislative power. *City of Warwick* v. *Warwick Regular Firemen's*

*Ass'n,* 106 R. I. 109, 256 A.2d 206 (1969). In order to meet the reasonableness test, a statute delegating power to private persons must satisfy both of the underlying concerns of the nondelegation doctrine. First, the Legislature itself must have decided the fundamental policy questions relevant to the legislative scheme. *Kugler* v. *Yocum,* 69 Cal. 2d 371, 445 P.2d 303, 71 Cal. Rptr. 687 (1968); *Montana-Dakota Util. Co.* v. *Johanneson,* 153 N.W.2d 414 (N. D. 1967). Second, such power "may not validly be delegated by the Legislature to a private body * * * where the exercise of such power is not accompanied by adequate legislative standards or safeguards * * * against arbitrary or self-motivated action on the part of such private body." *Group Health Ins.* v. *Howell,* 40 N. J. 436, 445, 193 A.2d 103, 108 (1963); *accord, Kugler* v. *Yocum, supra;* 1 Davis, *Administrative Law Treatise,* §2.14 (1958, 1970 Supp.); Note: *The State Courts and Delegation of Public Authority to Private Groups,* 67 Harv. L. Rev. 1398 (1954). It is not necessary in this case to decide whether or not the Legislature has abdicated its duty to make fundamental policy choices, for we believe this statute fails to meet the second requirement.

This statute contains no legislative standards whatsoever. The statute does not limit in any way the circumstances in which a school may declare that it serves a specific geographical area and thus command transportation services. Nor does the statute limit in any way the size of the service area that a private school may establish. These important matters are left entirely to the discretion of the private schools.

We also believe this statute lacks adequate safeguards against abuse. Courts commonly find that adequate safeguards exist where the private group has no opportunity or motive to exercise the delegated power in its own self-interest. For instance, a Wisconsin statute prohibiting

the unlawful sale of drugs was upheld, even though the definition of "drug" incorporated substances that might be listed in future editions of certain private publications. The court relied upon the fact that the lists were published for reasons *independent* of the statute: "The publications referred to in the statute are not published in response to any delegation of power, legislative or otherwise, by the statute. The compendia are published indepently of the statute and not in response to it. These books were published before the enactment of our statute and for an entirely different purpose." *State* v. *Wakeen,* 263 Wis. 401, 411, 57 N.W.2d 364, 369 (1953); *accord, Kugler* v. *Yocum, supra* at 379-80 n.6, 445 P.2d at 308-09 n.6, 71 Cal. Rptr. at 692-93 n.6; 1 Davis, *Administrative Law Treatise,* §2.14 at 144 (1958). Similarly, the California Supreme Court upheld a municipal ordinance requiring the city of Alhambra to pay certain of its employees salaries at least as high as those paid by neighboring Los Angeles. The court reasoned:

> "The proposed Alhambra ordinance contains built-in and automatic protections that serve as safeguards against exploitive consequences from the operation of the proposed ordinance. Los Angeles is no more anxious to pay its firemen exorbitant compensation than is Alhambra. Los Angeles as an employer will be motivated to avoid the incurrence of an excessive wage scale; the interplay of competitive economic forces and bargaining power will tend to settle the wages at a realistic level. As we noted in an analogous area involving the establishment of prices: 'the Legislature could reasonably assume that competition * * * coupled with * * * bargaining power * * * would provide a safeguard against excessive prices. In all probability, that safeguard is at least as effective as any which the Legislature could be expected to provide by promulgating explicit standards * * *.' " *Kugler* v. *Yocum, supra* at 382, 445 P.2d at 310, 71 Cal. Rptr. at 694; *accord, Baughn* v. *Gorrell & Riley,* 311 Ky.

537, 224 S.W.2d 436 (1949); *Male v. Ernest Renda Contracting Co.,* 64 N. J. 199, 314 A.2d 361 (1974).

A delegation will be held *unreasonable,* however, where the private party has the motive and the opportunity to exercise the power in his own self-interest. For instance, the New Jersey Supreme Court invalidated a statute which in effect required the state Medical Society to approve the formation of any group health plan. The court relied upon the fact that the Medical Society was given the power to veto the formation of a potential competitor.

> "* * * the statute sets forth no standards or safeguards to protect against unfairness, arbitrariness or favoritism * * *. This deficiency is especially crucial where, as here, the Medical Society's self-interest might tend to color its determination whether to approve the trustees of an applicant which may become a competitor of Blue Shield." *Group Health Ins. v. Howell, supra* at 477, 193 A.2d at 109; *accord, Blumenthal v. Board of Medical Examiners,* 57 Cal.2d 228, 368 P.2d 101, 18 Cal. Rptr. 501 (1962); *Fink v. Cole,* 302 N. Y. 216, 97 N.E.2d 873 (1951); *Union Trust Co. v. Simmons,* 116 Utah 422, 211 P.2d 190 (1949); *see Montana-Dakota Util. Co. v. Johanneson, supra; cf. United States Time Corp. v. Ann & Hope Factory Outlet, Inc.,* 98 R. I. 503, 508-10, 205 A.2d 125, 128-29 (1964).

The statute in question seems to us to have none of the safeguards which these courts have considered necessary to prevent arbitrary and selfish action by private parties. It invites private schools to act in their own self-interest by regionalizing or expanding their present territories and thereby passing their transportation costs onto public school districts. This additional expense is potentially enormous inasmuch as there is no limit on the area a private school can choose to "serve." For instance, a public school board in Westerly or Block Island might be required to transport students to a private school in Providence. Because of the opportunity for abuse inherent in this

statutory scheme, we believe this statute constitutes an unreasonable delegation of legislative power.

Thus, we conclude that §16-21-2 is unconstitutional as applied to private school "districts" not in existence when the statute was enacted.

We do not reach the petitioner's argument that §16-21-2 violates the "establishment of religion" clause of the first amendment of the United States Constitution.

The petition for certiorari is granted, and the cause is remanded to the Board of Regents for further proceedings consistent with this opinion.

Mr. Chief Justice Roberts was present at oral argument, but retired prior to consideration or decision of this case.

*John D. Biafore, Dennis H. Esposito,* for plaintiffs-respondents.

*Gorham & Gorham Incorporated, Bradford Gorham,* for defendant-petitioner.

*Amato A. DeLuca,* for American Civil Liberties Union, Amicus Curiae.