**In re ADVISORY OPINION TO the HOUSE OF REPRESENTATIVES (CASINO II).**

No. 2005–134–M.P.

Supreme Court of Rhode Island.

Sept. 19, 2005.

To the Honorable House of Representatives of the State of Rhode Island and Providence Plantations:

We have received from the Honorable House of Representatives a resolution requesting, in accordance with article 10, section 3, of the Rhode Island Constitution, our written opinion concerning the constitutionality of pending legislation. The proposed enactment at issue, entitled "Establishment and Extension of Gambling Activities and Other Facilities," would amend legislation that was passed by the Legislature in 2004 and codified at G.L. 1956 chapter 9.1 of title 41 (2004 Casino Act), but then vetoed by His Excellency Donald L. Carcieri, the Governor of Rhode Island. The Governor sent a request to the Rhode Island Supreme Court seeking an advisory opinion concerning the constitutionality of the 2004 Casino Act. Three-fifths of the Legislature voted to override the Governor's veto. An advisory opinion was issued on August 12, 2004,

indicating that the 2004 Casino Act indeed was constitutionally infirm, largely because the state would not be operating the casino as required by article 6, section 15, of the Rhode Island Constitution. *In re Advisory Opinion to the Governor (Casino)*, 856 A.2d 320 (R.I.2004) (hereinafter *Casino I*).

In 2005, legislation was introduced in the House of Representatives which seeks to revise chapter 9.1 of title 41 ("the proposed Casino Act"). Before voting on the newly proposed Casino Act—indeed, before consideration of the legislation by the House Finance Committee—the House of Representatives submitted the following questions to us in a request for an advisory opinion:

(1) "Would the proposed act, if duly enacted into law and approved by the electors of the state and town of West Warwick, comply with the requirement of Article VI, Section 15 of the Constitution of the State of Rhode Island and Providence Plantations that all lotteries permitted in Rhode Island be operated by the state?

(2) "Would the proposed act, if duly enacted into law and approved by the majority of the electors of the state and the majority of the electors of the town of West Warwick at the special election provided for by the proposed act, comply with the provisions of Article VI, Section 22 of the Constitution of the State of Rhode Island and Providence Plantations requiring a statewide and municipal referendum to become effective?

(3) "Would the proposed act, if duly enacted into law and approved by the electors of the state and the town of West Warwick, violate the equal protection clause of Article I, section 2 of the Constitution of the State of Rhode Island and Providence Plan-

tations, in (a) granting to the Narragansett Indian Tribe and its chosen partner the right to enter into an exclusive contract as casino service provider; or (b) in providing that the state retain a share of net casino gaming income that is different from the share of net income that the state retains from other gambling facilities in the state?

(4) "Would the proposed act, if duly enacted into law and approved by the electors of the state and the town of West Warwick, be violative of the equal protection clause of Amendment XIV, Section 1 of the Constitution of the United States, in (a) granting to the Narragansett Indian Tribe and its chosen partner the right to enter into an exclusive contract as casino service provider; or (b) in providing that the state receive a share of net casino gaming income that is different from the share of net income that the state receives from other gambling facilities in the state[?]"

After those questions were sent to the Supreme Court in the form of Resolution 2005-H-6396, the Court issued *In re Request for Advisory Opinion from the House of Representatives (casino bill)*, 875 A.2d 445 (R.I.2005) (mem.), setting forth an expedited briefing and oral argument schedule as requested by the House of Representatives. On June 27, 2005, the House of Representatives, the Governor, and the Attorney General all submitted briefs explaining their positions. In addition, amicus curiae briefs were filed by Lincoln Park, Inc. (Lincoln Park), Newport Grand Jai Alai, LLC (Newport Grand), the Town of West Warwick and, jointly, Harrah's Entertainment, Inc. (Harrah's), and the Narragansett Indian Tribe (Tribe). After the Court granted a one-

week extension, parties submitted reply briefs on August 3, 2005.[1] Each of the interested parties was given the opportunity to present oral argument on August 15, 2005.

# I

## Introduction

 When issuing advisory opinions, "the justices of this Court 'do not speak ex cathedra, from the chair of judgment, but only as consultors somewhat like the jurisconsults under the Roman law.' * * * Speaking in our individual capacities as legal experts rather than Supreme Court justices, we are unable to exercise the fact-finding power of the Court. * * * Because this opinion is not an exercise of judicial power, it is not binding and 'it carries no mandate.'" *Casino I*, 856 A.2d at 323.

While we are constitutionally obligated to issue advisory opinions in certain situations, we are conversely prohibited from issuing advisory opinions when other circumstances exist.

"Our general obligation to issue advisory opinions comes from article 10, section 3, of the Rhode Island Constitution, which provides: '[t]he judges of the supreme court shall give their written opinion upon any question of law whenever requested by the governor or by either house of the general assembly.' There are, however, certain procedural hurdles that must be cleared before our duty to

issue an advisory opinion arises. 'We are constitutionally obligated to give advisory opinions to either House of the General Assembly only when the questions propounded concern the constitutionality of pending legislation, and to the Governor only when the questions propounded concern the constitutionality of existing statutes which require implementation by the Chief Executive.'" *Casino I*, 856 A.2d at 324 (quoting *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1318–19 (R.I.1986)).

Since the proposed legislation is still in the House Finance Committee, there is no doubt that it is pending in the traditional sense. And, while we do have an obligation to render an advisory opinion on pending legislation when requested to do so by the Legislature, *id.*, we are nonetheless hesitant to do so in this situation. The legislation at issue not only is pending; it is in a largely underdeveloped and inchoate state.

Separate and apart from our substantive concerns, the proposed Casino Act requires technical revision. For example, after the proposed Casino Act was drafted, the Lottery Commission, the entity designated in the proposed statute to operate the proposed casino, proposed G.L.1956 § 41–9.2–2(1), was abolished by P.L. 2005, ch. 234, and replaced by the State Lottery Division of the Department of Administration. Although this substitution of a key governmental agency in the proposed Casino Act does not alter our analysis here,[2]

---

1. We note that Lincoln Park was sold to UTGR, Inc., d/b/a Lincoln Park, after the original briefs were filed but before the reply briefs were submitted to this Court. Therefore, the reply briefs technically were submitted by a business entity that was different from the one that submitted the original briefs but, for the sake of clarity, we will refer to both entities interchangeably and only as Lincoln Park.

2. We pause briefly to address the casino opponents' argument that the abolition of the Lottery Commission destroys the "pending" status of the proposed Casino Act, rendering it inappropriate for an advisory opinion. The new law amends G.L. 1956 chapter 61 of title 42 by abolishing the Lottery Commission and placing lottery authority in a "State Lottery Division" of the Department of Administration. In conjunction with the newly named

we respectfully suggest that it would seem proper for the honorable members of the House to revise the legislation to reflect this change.

Another inherent complication of the proposed Casino Act is the fact that proposed § 41–9.2–5(a) calls for a specific special election "to take place on November 8, 2005." Proposed § 41–9.2–5(e) states that: "In the event that the affirmative vote of both the Town of West Warwick and the electors of the state does not occur * * * then this chapter shall cease to have effect, and shall become null and void." Read together, these provisions constitute a sunset clause, nullifying the entire statute, effective November 8, 2005, absent majority statewide and local approval at a November 8, 2005 special election. With the November 8, 2005 deadline looming, it appears unlikely that the General Assembly can amend, consider, and pass the legislation; that the Governor can consider, and then sign or veto that legislation; that the General Assembly can consider an override of a veto, if any; and that the Secretary of State can place the question on the ballot for a special election, all by that date. We duly note that we received this request late in our own 2004–05 term and that we then set the schedule for briefing and oral argument at the earliest possible time.

Also complicating our analysis is the fact that the proposed Casino Act will not be the final statement of the rights and responsibilities of the parties; the proposed legislation directs the Division to enter into a master casino service contract with the casino service provider. Proposed § 41–9.2–9(a). The uncertainty that flows from the lack of a written and executed contract has significantly complicated our attempt to render advice on the constitutionality of the proposed Casino Act.

Nonetheless, we will adhere to our constitutional obligation to answer proper requests for advisory opinions when it is possible for us to do so. We proceed to answer the questions propounded as best we can, reviewing the proposed Casino Act on its face and avoiding any speculation resulting from its inchoate state.

## II

### Standard of Review

■ The applicable standard of review is as follows:

"In answering [questions of constitutional interpretation], we are guided by the principle that legislative enactments enjoy a presumption of validity and constitutionality. * * * 'The act must stand as valid, unless we are convinced beyond a reasonable doubt, that it is contrary to

Lottery Division, the General Assembly retains oversight through the "Permanent Joint Committee on State Lottery." G.L. 1956 chapter 14.2 of title 22. Proposed G.L.1956 § 41–9.2–3(16) defines "[c]ommission" or "Lottery Commission" as

"the state Lottery Commission as created by chapter 61 of Title 42, or any board, commission, or agency that is created by the General Assembly as a successor to the state Lottery Commission as created by chapter 61 of title 42, or any other board, commission, or agency established by the General Assembly to operate the casino gaming facility as provided by this act."

The Legislature clearly anticipated the abolition of the Lottery Commission and took the necessary precautions in the proposed Casino Act. Accordingly, the change does not render the proposed Casino Act moot, nor does it motivate us to decline to address the questions sent to us by the Legislature.

In accordance with this change, we hereinafter refer to the state's governing body over lotteries by its new name, the State Lottery Division of the Department of Administration, "Division of Lottery," or, simply, the "Division."

a provision which is either expressly set forth in the State constitution or must, beyond a reasonable doubt, be necessarily implied from language expressly set forth therein.'" *Casino I,* 856 A.2d at 327 (quoting *In re Advisory Opinion to the House of Representatives,* 485 A.2d 550, 552 (R.I.1984)).

## III

### Question I:

### State Operation

Article 6, section 15, of the Rhode Island Constitution reads in pertinent part: "All lotteries shall be prohibited in the state except lotteries operated by the state * * *." As was true in 2004, the General Assembly continues to have in 2005 "plenary power to legislate on all matters pertaining to gambling in this state." *Casino I,* 856 A.2d at 323; *see also Narragansett Indian Tribe of Rhode Island v. State of Rhode Island,* 667 A.2d 280, 281 (R.I.1995) ("exclusive authority over lotteries in this state is, and has always been, vested in the General Assembly"). Nevertheless, it is the function of this Supreme Court "to interpret the statutes of this State with the view of determining their constitutionality." *Payne & Butler v. Providence Gas Co.,* 31 R.I. 295, 313, 77 A. 145, 153 (1910). Bearing these principles in mind, we turn to the initial question posed by the honorable members of the House—viz., whether the proposed legislation vests operational control of the casino in the Division of Lottery.

In *Casino I,* 856 A.2d at 328–29, we first found a casino to be a lottery under the "dominant factor" doctrine. Based on that conclusion, we then opined that the casino proposed by the 2004 Casino Act would violate article 6, section 15, because Harrah's, and not the state, would retain "operational control" over the lottery facility.

*Casino I,* 856 A.2d at 332. We interpreted the word "operate" as "the power to make decisions about *all aspects* of the functioning of a business enterprise." *Id.* at 331 (emphasis added). Analyzing the respective powers of the then Lottery Commission and Harrah's as outlined by the legislation at issue in that case, we stated:

"Under the Casino Act, Harrah's would make day-to-day decisions having to do with the functioning of the proposed casino while the Lottery Commission merely would enforce the applicable regulations. Unlike proceeds generated from the sale of state lottery tickets, which must be held in trust until paid into the state lottery fund, * * * daily revenue generated at the casino would go directly to Harrah's rather than to the state. Also, unlike the relationship of Lincoln Park and Newport Grand with the Lottery Commission in the case of Video Lottery Terminals, Harrah's would be acting as more than a state agent hosting games on behalf of the state. Therefore, under the Casino Act, Harrah's would have operational control of the proposed casino while the Lottery Commission would have only regulatory control." *Id.* at 331–32.

Although we recognize that the House has taken great strides in the proposed Casino Act toward meeting the constitutional requirement of state operation, we believe that, when considered in light of the explicit language of our constitution, the act has several significant shortcomings, at least some of which are constitutionally fatal.

### A

### Non–Slot Table Games

■ We begin our analysis with the issue of non-slot games, also commonly referred to as table games. At first glance the proposed act's broad language appears

to give the Division of Lottery total control in "[d]etermining and approving" the types of table games "to be conducted at the casino gaming facility." Proposed § 41–9.2–8(a)(19)(ii). However, in the same provision, such apparently overriding powers are rendered illusory by the requirement that the Division "*shall permit* the casino service provider to conduct at the casino gaming facility any [table game] that is regularly conducted at any other casino gaming facility." *Id.* (emphasis added). Based on this language, the Division has no control over what table games are played at the casino; the only restraint is that such game must be played regularly in some other gaming facility. Furthermore, since the "National Gaming Company"[3] must operate "in at least four jurisdictions within the United States," proposed § 41–9.2–3(39), it will be able to exercise *de facto* and largely unmitigated control over the types of games being played at the West Warwick facility simply by introducing a game in any of its other casinos. This is clearly inconsistent with the constitutional requirement that *the state* have "the power to make decisions about all aspects or the functioning of [the casino]." *Casino I,* 856 A.2d at 331.

## B

## Extension of Credit

■ We next turn to the extension of credit to patrons of the proposed casino. The proposed Casino Act allows the casino service provider to extend credit to patrons in the form of a "cash advance," which is defined as "funds * * * for gaming activity * * * advance[d] in return for

a negotiable instrument of the same value from the patron." Proposed § 41–9.2–3(5). As drafted, the Division has no control over the extension of credit. We cannot entertain the speculative argument that some yet-to-be-promulgated regulation somehow may remedy the proposed legislation in the future by outlining the Division's role in the extension of credit. *See* proposed § 41–9.2–8(a)(23)(c) (granting the Division the power to promulgate regulations). Viewing the statute on its face, as we must, control of credit is solidly in the hands of the casino service provider.

In addition, the extension of credit also is an operationally significant aspect of the casino arrangement because the act appears to allow the casino service provider to pass on to the state the cost of bad debts used to collateralize cash advances. This is so because the state's share, *see* proposed § 41–9.2–9(a)(vii), is taken from "net casino gaming income." That term is defined as "gross receipts less the total of all sums paid out as winnings * * *," proposed § 41–9.2–3(40), while the definition of gross receipts includes "the total of all sums received on behalf of the state * * * including valid checks, currency, tokens, coupons, vouchers, or instruments of monetary value, whether collected or uncollected, * * * less a deduction for uncollectible casino gaming receivables," proposed § 41–9.2–3(27). Although the Division could, by future regulation, carefully define the term "uncollectible gaming receivables" such that the state would not bear the burden of any ill-advised extension of credit, that hypothetical future possibility is not nearly enough for us to say at this time that the extension of credit at the

---

**3.** The proposed Casino Act defines "National Gaming Company" as "a private gaming business operating in at least four jurisdictions within the United States, with more than eighty percent of its total assets in the United States, that has the financial resources to

comply with the provisions of the Act and experience in the design, construction, and operation of a casino gaming facility as described in the Act." Proposed § 41–9.2–3(39). For further discussion, *see infra* Part III. D.

proposed casino would satisfy the constitutionally-based requirement that "all aspects" of the operation of the casino be under state control.

## C

### Sovereign Immunity

We also find the proposed Casino Act deficient in terms of the constitutional requirement of state operation because of the unresolved sovereign immunity issue. Our specific operational concern with sovereign immunity relates, of course, to the issue of the enforceability of the to-be-determined agreement between the Division and the casino service provider,[4] known as the master casino service contract. As a general matter of black letter law, "[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation." *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 760, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). The tribes are subject to suit only if Congress, or the tribe itself, has waived immunity. *Id.* at 754, 118 S.Ct. 1700. Absent such a waiver, sovereign immunity threatens to render nugatory state operational control of the proposed casino.

The status of the Tribe's sovereign immunity for various activities has been, and continues to be, the subject of ongoing controversy. The Rhode Island Indian Claims Settlement Act, 25 U.S.C. §§ 1701–1716, extinguished tribal claims to non-settlement lands and subjected settlement lands to "the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708. But the federal statute did not definitively resolve all the sovereign immunity issues; instead, the Tribe's sovereign immunity "is an ongoing and overarching question which has vexed the State and Tribe over the years as various issues have arisen. * * * [A]ll of the relevant questions cannot be answered by an all-encompassing solution." *Narragansett Indian Tribe of Rhode Island v. State of Rhode Island*, 407 F.3d 450, 461 (1st Cir.), *vacated in part, Narragansett Indian Tribe v. State of Rhode Island*, 415 F.3d 134 (1st Cir.2005).[5]

The Narragansetts, in their reply brief, and the House, in answer to our questions at oral argument, expressly stated that the Tribe would be willing to waive sovereign immunity in the master casino service contract. Whether such a waiver would, in fact, become part of the written contract in satisfactory language is, however, by no means a certainty.[6] Given that the Tribe

---

**4.** The proposed Casino Act defines "casino service provider" as "the entity established by the Narragansett Indian Tribe in conjunction with an affiliate of a National Gaming Company, which entity will enter into a master casino service agreement with the [Division]." Proposed § 41–9.2–3(14).

**5.** As if to confirm the description of this issue as "vexing," the First Circuit since has vacated certain parts of the panel opinion (not cited herein) and scheduled an *en banc* hearing for December 2005. *Narragansett Indian Tribe v. State of Rhode Island*, 415 F.3d 134, 135 (1st Cir.2005), *vacating in part Narragan-*

*sett Indian Tribe of Rhode Island v. State of Rhode Island*, 407 F.3d 450 (1st Cir.2005).

**6.** This uncertainty serves as *yet another* example of the inchoate nature of this legislation; had hearings been held and debates occurred, the issue of sovereign immunity might have been worked out before our advice was requested. The proposed Casino Act's silence on this very fundamental and critical matter gives us pause for two reasons: one legal and the other practical. As a legal matter, we are not convinced that the Tribe's waiver of sovereign immunity is as simple as an individual's waiver of any immunity that he or she might retain, such as one afforded by an

might well be immune from suit on the contract, its sovereign immunity raises significant questions about the state's ability to control "all aspects"—or even *any* aspect—of the casino.[7] It would seem highly advisable to condition the Division's power to enter into any master casino service contract expressly on the Tribe's absolute waiver of sovereign immunity.

## D

### Choice of Casino Service Provider

■ Next, we come to our fourth area of significant concern with respect to the constitutional requirement that any casino be operated by the state. That concern centers on the role of the state—or lack thereof—in choosing the casino service provider. The proposed Casino Act "authorize[s], empower[s], and direct[s]" the Division "to enter into a master casino service contract with the casino service provider," proposed § 41–9.2–9(a), and formally defines the "casino service provider" as "the entity established by the Narragansett Indian Tribe in conjunction with an affiliate of a National Gaming Company," proposed § 41–9.2–3(14). The proposed act further equates the casino service provider with "an entity composed of

the Narragansett Indian Tribe and its *chosen partner.*" Proposed § 41–9.2–2(1) (emphasis added). On the other hand, the act gives the Division the power "[t]o investigate and determine the suitability of the casino service provider." Proposed § 41–9.2–8(1).

Arguably our concern in this regard presents a closer case in terms of "operation" than the state's inability to ban particular table games or control the extension of credit at the proposed casino. For purposes of analysis, we first reiterate our definition of "operate" from *Casino I:* "the power to make decisions about *all aspects* of the functioning of a business enterprise." *Casino I,* 856 A.2d at 331 (emphasis added). Our previous advisory opinion carefully distinguished operational control from regulatory control, which we defined as: "to adjust by rule, method or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Id.* (quoting Black's Law Dictionary 1286 (6th ed. 1990)). The power to veto proposed partners to the casino contract on suitability grounds is more in the nature of regulatory power. Furthermore, the power to choose is qualitatively different from the lesser power of vetoing another's choice. *Cf. Neff v. American*

---

applicable statute of limitations. When we inquired at oral argument about precisely what is the legal mechanism whereby the Tribe could go about waiving its sovereign immunity, this Court did not receive anything close to a definitive answer. Furthermore, as a practical matter, any waiver of sovereign immunity would be in the context of intricate contract negotiations between the Tribe and the state. Being mindful of the wisdom in the ancient proverb that warns "many things happen between the cup and lip," we are disinclined to rely on such uncertainty.

7. It should be noted that the United States Supreme Court in *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 532 U.S. 411, 423, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001), found the tribe in

that case subject to suit in contract, *Kiowa* notwithstanding. This was because the tribe's proposing and signing the agreement at issue in that case constituted a waiver of sovereign immunity. *Id.* Similarly, the First Circuit held an arbitration clause enforceable against the Narragansett Indian Wetuomuck Housing Authority, (a tribal entity), because the clause established a "direct, clear, and unavoidable" waiver. *Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority,* 207 F.3d 21, 31 (1st Cir. 2000). Obviously, the state and the Tribe should endeavor to settle this important matter before it devolves into litigation, as befell the unlucky contractor in *Ninigret Development Corp.*

*Dairy Queen Corp.*, 58 F.3d 1063, 1066, 1068–69 (5th Cir.1995) (interpreting the term "operate" in the context of the Americans with Disabilities Act and holding that veto power "without more, is insufficient to support a holding that [the franchisor] 'operates' [the store in question] in the ordinary and natural meaning of that term").

In the context of the proposed Casino Act, the state's ability to "determine the suitability" of the Tribe's "chosen partner" is the equivalent of a veto power, which is regulatory in nature. Mere regulatory power over the most fundamental aspects of the gaming business—selection of the casino service provider—certainly falls short of "operating" "all aspects" of the facility.[8]

## E

### Nondelegation

Although we are hesitant to grapple with issues not specifically mentioned in your request for our advisory opinion, we deem it beneficial to note that many of these "operational" issues—most notably, the state's inability to determine which

types of table games may be played at the proposed casino—are intrinsically related to the nondelegation doctrine.[9]

The nondelegation doctrine is derived from sections 1 and 2 of article 6 of the Rhode Island Constitution; it is of constitutional magnitude in its own right. *Metals Recycling Co. v. Maccarone*, 527 A.2d 1127, 1129 n. 5 (R.I.1987). The nondelegation doctrine "serves the dual purposes of protecting the 'citizens against discriminatory and arbitrary actions of public officials, * * * and the assurance that duly authorized, politically accountable officials make fundamental policy decisions.'" *Kaveny v. Town of Cumberland Zoning Board of Review*, 875 A.2d 1, 11 (R.I.2005) (quoting *Marran v. Baird*, 635 A.2d 1174, 1179 (R.I.1994)); *see also City of Warwick v. Warwick Regular Firemen's Association*, 106 R.I. 109, 117, 256 A.2d 206, 211 (1969) (noting that "[i]t is settled in this state * * * that there may not be an unconditional delegation of legislative power").

In cases of delegations to *private* entities,[10] we have applied an exigent test to

---

8. The General Assembly has gone to great lengths to describe the proposed lottery as a "state operated casino" throughout the proposed Casino Act. We are reminded of the late Rhode Island Supreme Court Justice John P. Bourcier who often said, "Labeling a cat a dog certainly will not cause a cat to bark." *E.g., Cohen v. Harrington*, 722 A.2d 1191, 1195 (R.I.1999). We wish to stress that merely calling a casino "state operated" does not make it so for purposes of fulfilling the very explicit terms of our Constitution.

9. In *City of Warwick v. Warwick Regular Firemen's Association*, 106 R.I. 109, 113, 256 A.2d 206, 209 (1969), we summarized as follows the essence of the nondelegation doctrine as it has been recognized in this state's jurisprudence: "It is well-settled in this state that the general assembly may not unconditionally delegate any of its legislative power and that any attempt to so delegate such legislative power is unconstitutional and void."

10. Some have argued persuasively that the delegation of governmental power to a private, for-profit entity, such as the casino service provider, is of particular concern:

"What is it about a delegation of governmental power to a *private* actor that we find so worrisome? What, at bottom, troubles the courts so that they invalidate the legislation or other action making the delegation? The concern is that governmental power—power coercive in nature—will be used to further the private interests of the private actor, as opposed to some different public interest." David M. Lawrence, *Private Exercise of Governmental Power*, 61 Ind. L.J. 647, 659 (1986); *see also Stewart v. Utah Public Service Commission*, 885 P.2d 759, 776 (Utah 1994) ("The veto power granted by the statute to a utility is a power that can be used to advance only the shareholders' interests, without regard to either the rate-

ensure that the aforementioned dual purposes of nondelegation are satisfied. *Jennings v. Exeter–West Greenwich Regional School District Committee,* 116 R.I. 90, 98, 352 A.2d 634, 638 (1976); *accord Jamestown School Committee v. Schmidt,* 122 R.I. 185, 199, 405 A.2d 16, 24 (1979). In *Jennings,* we wrote the following:

> "First, the Legislature itself must have decided the fundamental policy questions relevant to the legislative scheme. * * * Second, such power 'may not validly be delegated by the Legislature to a private body * * * where the exercise of such power is not accompanied by adequate legislative standards or safeguards * * * against arbitrary or self-motivated action on the part of such private body.' " *Jennings,* 116 R.I. at 98, 352 A.2d at 638 (quoting *Group Health Ins. v. Howell,* 40 N.J. 436, 193 A.2d 103, 108 (1963)).

At least as to the table games issue, we think the proposed Casino Act fails to meet the standards that are set forth in such cases as *Jennings* and *Jamestown School Committee.* The casino proponents' argument that the General Assembly purposefully made a policy choice to permit "any game or gambling game that is regularly conducted at any other casino gaming facility," proposed § 41–9.2–8(19)(ii), based on the legislative concern that the casino be able to "compete effectively with casino-resorts in nearby jurisdictions," proposed § 41–9.2–2(3), is suffi-

cient only to take the proposed Act past the first prong of *Jennings.* In this case, the General Assembly's standard—*a priori* approval of any table game "that is regularly conducted at any other casino gaming facility"—is simply no standard at all. Proposed § 41–9.2–8(19)(ii). As noted above, the casino service provider will be able to exercise *de facto* and largely unmitigated control over the table games at the proposed casino by simply first introducing the table game at a casino in another jurisdiction. *See supra* Part III.A. Accordingly, the statute lacks " 'standards or safeguards against * * * arbitrary or self-motivated action,' " *Jennings,* 116 R.I. at 98, 352 A.2d at 638–39, by the casino service provider, and therefore, it is our very definite belief that the proposed Casino Act, in its present form, would be found to be violative of the nondelegation doctrine in a proper legal challenge.

### F

### Powers Retained by the Division of Lottery

Although we have several concerns with the proposed Casino Act, our analysis would be incomplete without recognizing the ways in which the legislation, as compared with its predecessor, appears to vest operational control in the state.

---

payers' interests or the overall public interest.").

In *Jennings v. Exeter–West Greenwich Regional School District Committee,* 116 R.I. 90, 100, 352 A.2d 634, 640 (1976), we invalidated a state statute requiring public school systems to bus children to nonpublic schools because it invited those nonpublic schools to "regionaliz[e] or expand [ ] their present territories and thereby pass [ ] their transportation costs onto public school districts." We emphasized that the statute failed to limit the possi-

ble future "arbitrary and selfish action" by those nonpublic schools. *Id.* If possible arbitrary and selfish actions by nonpublic schools (presumably nonprofit entities) were of such concern in *Jennings,* then any delegation of legislative power to a "National Gaming Company," proposed § 41.9.2–3(14), which unquestionably would be a private, for-profit corporation, is *a fortiori* of greater concern in view of the strictures of the nondelegation doctrine.

A significant aspect of state control is the ability to direct daily revenue. Under the 2004 Casino Act, "daily revenue generated at the casino would go directly to Harrah's rather than to the state." *Casino I*, 856 A.2d at 332. In contrast, the proposed Casino Act requires the casino service provider:

> "[T]o collect * * * all net casino gaming income from casino gaming operations at the casino gaming facility on behalf of the state and [Division], to transfer the net casino gaming income to a bank account of the State and [Division] * * * less such monies as necessary to maintain a casino bankroll for the operation of all games at the casino gaming facility as determined by the [Division], and to further provide such accounting systems, information technology, and related software to accurately track all transactions * * *." Proposed § 41–9.2–9(a)(vii).

These payments would be made daily "on an estimated basis, with a monthly accounting based on actual results." Proposed § 41–9.2–10(c). The Division then would be responsible for distributing at least 25 percent of the net casino gaming income to the state's general fund, proposed § 41–9.2–10(b)(i), and then distributing the remainder back to the casino service provider so that it can pay its employees and other operational expenses, proposed § 41–9.2–10(b)(ii). By allowing the Division to hold the daily net gaming income, the proposed Casino Act clearly allows the state to exercise a greater degree of financial control over the gaming facility than was the case under the former legislation.[11]

The proposed Casino Act also expressly empowers the Division to monitor all "gaming devices," commonly termed video lottery terminals (VLTs), on a "slot data system" that will connect all the VLTs "operated by the state within the casino gaming facility." Proposed § 41–9.2–9(a)(v). Furthermore, the casino service provider must provide the Division with "a separate room at the casino gaming facility where the [Division] shall have access to the slot data system." *Id.* Finally, the Division, while monitoring the VLTs on the slot data system, would retain "the ability to direct the casino service provider to turn off any gaming device in the event of an integrity concern relating to a gaming device or other threat to the public

---

11. The proposed Casino Act also grants the Division a host of powers related to the casino's accounting and finances. The casino service provider must "maintain on behalf of the [Division] an annual balance sheet, profit and loss statement, and any other information the [Division] considers necessary in order to effectively administer this chapter, all rules promulgated by the [Division], and orders and final decisions made under this chapter." Proposed § 41–9.2–8(a)(8). In addition to this annual accounting, the Division has the power to "conduct periodic compliance or special or focused audits of the casino gaming facility [that will be] conducted by state agency personnel or private sector audit firms." Proposed § 41–9.2–8(a)(15). To help facilitate this power, the casino service provider will be required to keep all financial records "on the premises of the casino gaming facility or accessible from the premises in the manner prescribed by the [Division]." Proposed § 41–9.2–8(a)(7). Furthermore, the Division has the power to "inspect and examine all premises within the casino gaming facility or facilities containing records of casino gaming or in which the business of a casino gaming supplier is conducted, or where any records of any activities related to casino gaming are prepared." Proposed § 41–9.2–8(a)(3)(i). Finally, the Division reserves the right to "inspect, examine, audit, impound, seize, or assume physical control of, or summarily remove from the casino gaming facility" a wide variety of records, equipment, and other relevant materials. Proposed § 41–9.2–8(a)(3)(ii).

trust * * *." *Id.*[12]

The proposed legislation also appears to reserve for the Division the power (1) to set the number of VLTs and non-slot table games to be played at the casino, and (2) to set the odds of winning. Regarding the number of games, the Division would have the following powers:

"Determining and approving the manner * * * of gaming devices to be operated at the casino gaming facility. No fewer than 2,500 and as many as 5,000 gaming devices shall be operated at the facility.

"Determining and approving the number * * * of games and gambling games to be conducted at the casino gaming facility, * * * provided that no fewer than 100 and as many as 300 games and gambling games shall be operated at the facility, unless the [Division] determines, upon recommendation of the casino service provider, that market conditions in

competing jurisdictions require a greater or lesser number of games and gambling games." Proposed § 41–9.2–8(a)(19)(i), (ii).[13]

Regarding the odds of winning, the Division would have the following powers:

"Determining and approving the theoretical pay out percentages of gaming devices to be conducted at the casino gaming facility that shall be competitive with other casino resorts in the market, except that the theoretical pay out percentages shall not be less than 80%.

"Defining and limiting the rules of play and odds of authorized games, and the method of operation of such games, including the maximum and minimum wagers." Proposed § 41–9.2–8(a)(19)(iii),(iv).

The power to set the number of VLTs and non-slot table games (coupled with the power to set the odds) is a substantial one

---

**12.** Worthy of further note is the act's definition of "gaming device," which is limited to "any equipment or mechanical, electromechanical, or electronic contrivance, component or machine used directly or indirectly in connection with casino gaming or any game that affects the result of a wager by determining win or loss" and "does not include a system or device which affects a casino game solely by stopping its operation so that the outcome remains undetermined." Proposed § 41–9.2–3(26). Although the power to turn off non-slot table games and the power to turn off VLTs are equally essential to the exercise of operational control, the above definition could be interpreted to prohibit the Division from turning off non-slot table games, because they do not fit the definition of a gaming device. In addition, we note that the proposed Casino Act also does not provide the Division with the ability to monitor the non-slot table games in the same manner as it will be able to monitor the VLTs. As accurately recognized by Newport Grand in its brief, "the nature of these table games is such that they do not lend themselves to the type of centralized computer system that the State utilizes for its operation of VLTs at Newport

Grand." Although the nature of the activities may be different, the monitoring of table games is as important as the monitoring of VLTs for purposes of exercising operational control over the casino.

**13.** We pause here to identify what we believe may be a slight error in the legislative drafting of proposed § 41–9.2–8(a)(19)(i). Although casino proponents cite liberally to that subsection for the proposition that the Division will determine the actual number of VLTs to be played at the casino, the actual wording of the provision does not use the term "number," but rather grants the power to determine and approve "the *manner and type* of gaming devices to be operated at the casino gaming facility." *Id.* (emphasis added). In contrast, the parallel provision governing non-slot table games grants the power to determine and approve "the *number and type* of games and gambling games to be conducted at the casino gaming facility." Proposed § 41–9.2–8(a)(19)(ii) (emphasis added). As drafted, proposed § 41–9.2–8(a)(19)(i) is open to an interpretation that the Division does not retain the power to set the actual number of VLTs.

that undeniably would allow the state to exercise a significant degree of operational control over the casino.[14]

Finally, the Division's ability to exercise control over the casino is not limited solely to those powers expressly granted by the proposed legislation. The proposed Casino Act also bestows upon the Division "all other powers necessary and proper to fully and effectively execute and administer the provisions of this chapter for its purpose of allowing the state to operate a casino gaming facility." Proposed § 41-9.2-7(1). Although a statutory grant of "necessary and proper" powers has been interpreted as a "plenary power" with "wide latitude," *City of Newport v. Newport Water Corp.*, 57 R.I. 269, 279, 281, 189 A. 843, 848 (1937), such a statutory grant cannot be read so broadly that it can be deemed to override express limitations on the Division's own power. *Cf. McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819) (limiting the powers derived from the necessary and proper powers in the federal constitution to those that are not "prohibited" and are consistent "with the letter and spirit of the constitution"). For example, the proposed Casino Act contemplates exclusively granting to the casino service provider the power to extend credit, proposed § 41-9.2-3(5); this prevents us from interpreting the Division's power to do all things necessary and proper to operate the casino as granting the Division with the implied power to set and control the extension of credit. Although we readily acknowledge that the necessary and proper power is far from illusory, it

does not cure all of the constitutional ills discussed above.

G

**Comparisons with Lincoln Park and Newport Grand**

Several arguments in the briefs submitted to this Court distinguish the proposed Casino Act from the current statutory and regulatory framework governing Lincoln Park and Newport Grand to support the argument that the proposed Casino Act is unconstitutional. Arguments such as this ostensibly flow from the following admonition in *Casino I*, 856 A.2d at 332: "[U]nlike the relationship of Lincoln Park and Newport Grand with the Lottery Commission in the case of Video Lottery Terminals, Harrah's would be acting as more than a state agent hosting games on behalf of the state." We expressly state now that our reference to Lincoln Park and Newport Grand as mere examples of state-operated gaming facilities did not establish them (or, for that matter, other state lotteries) as the constitutional baseline of state operation. Put differently, the fact that the proposed casino does not emulate Lincoln Park and Newport Grand in every conceivable way is not fatal to its constitutionality.

To summarize, we interpret the proposed Casino Act as granting to the Lottery Division the power to make decisions concerning many, but not all, operational

---

14. Various parties in opposition point to the proposed Casino Act's specificity in terms of the number of gaming devices, and minimum payout of those devices, as well as the number of table games, as demonstrating the illusory nature of the Division's actual operational control. We disagree. On the contrary, these parameters serve the important function of ensuring that the Division's authority is sufficiently "canalized within banks." *Almond v. Rhode Island Lottery Commission*, 756 A.2d 186, 191-92 (R.I.2000) (quoting *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (Cardozo, J., concurring)). *See supra* Part III.E. (discussing the implications of the proposed Casino Act with respect to the nondelegation doctrine).

aspects of the gaming enterprise.[15] Even giving the proposed legislation every reasonable presumption of constitutionality, the state simply cannot in good faith be said to be operating the casino if it does not at least have the power to: (1) control the types of non-slot table games; (2) control or deny the extension of credit; (3) choose its partner in the casino service provider contract; and (4) to protect its contractual rights by requiring the Tribe's absolute waiver of sovereign immunity.

For the reasons stated, we answer the first question in the negative.

## IV

## Question II:

## The Referendum

 We next turn to the second question posed by the honorable members of the House, which deals with the constitutionality of the proposed referendum question, in light of article 6, section 22, of the Rhode Island Constitution. That constitutional provision mandates that:

> "No act expanding the types of gambling which are permitted within the state or within any city or town therein or expanding the municipalities in which a particular form of gambling is authorized shall take effect until it has been approved by the majority of those electors voting in a statewide referendum and by the majority of those electors voting in a referendum in the municipality in which the proposed gambling would be allowed." *Id.*

In our previous advisory opinion on the 2004 Casino Act, we noted that the sections 22 and 15 of article 6 imposed independent requirements on the expansion of lotteries in Rhode Island. *Casino I*, 856 A.2d at 333 (noting our "inexorable conclusion" that the 2004 Casino Act was subject to both provisions). None of the parties disputes the applicability of article 6, section 22, and we see no reason why it does not apply to the proposed Casino Act; the bill unquestionably calls for an expansion of the lottery both statewide and within the Town of West Warwick.

The proposed Casino Act requires majority approval by statewide special election of a referendum question asking: "Shall the state operate a casino gaming facility in the Town of West Warwick?" Proposed § 41–9.2–5(a). Proposed § 41–9.2–5(b) requires that prior to any such statewide referendum question, the Division must certify to the Secretary of State a "statement of intent" filed by the casino service provider, evidencing that the West Warwick Town Council has adopted a resolution to place the referendum question on the special election ballot to be submitted to the electors of the Town of West Warwick. As long as these requirements are carried out and provided that the subsequent referenda questions receive local and statewide majority approval, the requirements of article 6, section 22 would be satisfied.

As amici, the Tribe and Harrah's raised the additional issue of whether article 6,

---

**15.** We remain acutely aware of the fact that we are confronted by a *constitutional* provision. A constitutional provision differs from a statute in that it is part of an organic document and it cannot be altered lightly. The people of our state opted to include in the constitution very specific language to keep the control of gambling in state hands. Unless and until that constitutional provision is altered, we are obliged to scrutinize all gambling-related legislation in light of that constitutional provision. The question before us is *not* whether the creation of a casino would be a good thing for Rhode Island; the question before us is solely whether the proposed Casino Act is consistent with the constitutional command of article 6, section 15, of the Rhode Island Constitution.

section 22's requirement may be met by referendum at a special election instead of a general election, and they argued that a referendum by special election is permissible. We agree.

As quoted above, the provision requires any expansion of gambling to be approved by "majority of those electors voting in a *statewide referendum*" as well as a "majority of those electors voting in a *referendum in the municipality*" in which the proposed gambling would be expanded. R.I. Const., art. 6, sec. 22 (emphases added). In contrast, there are some referenda provisions in our constitution which specifically require approval by general election referendum. For example, article 14, section 1, of the Rhode Island Constitution requires that proposed constitutional amendments must be "submitted to the electors at the next *general election*" for approval. (Emphasis added.) Likewise, section 2 of article 14, governing constitutional conventions, requires the General Assembly to submit "at any *general election*" the question, "Shall there be a convention to amend or revise the Constitution?" (Emphasis added.) Clearly, the drafters of our constitution had a firm grasp of the language required to restrict referendum issues to the general election calendar. They did not do so in the case of article 6, section 22. Accordingly, the question of whether the referendum question eventually is considered in a special election or as part of a general election is of no constitutional importance.

For the reasons stated, we answer the second question in the affirmative.

## V

## Questions 3 & 4

## Equal Protection

We next address the third and fourth questions, which center around the constitutionality *vel non* of the proposed Casino Act when considered in light of the constitutional equal protection guarantees. We are acutely aware of the challenging questions that the proposed legislation raises with respect to the federal (U.S. Const. Amend. XIV) and Rhode Island (R.I. Const. art. 1, sec.2) constitutional guarantees of equal protection. It is our judgment, however, that it would be foolhardy of us to attempt to answer those questions in the context of this advisory opinion.

First, we hesitate to delve into an equal protection analysis of a statute that fails to meet the explicit constitutional requirement that the casino be operated by the state. Were this a decision dealing with an actual case or controversy rather than an advisory opinion, a discussion of equal protection would be pure dicta in light of our conclusion that the proposed legislation does not vest operational control in the state. Thus, any analysis on this issue would seem to be premature.

Second, and more importantly, for the equal protection issues to be intelligently analyzed and for a well-supported opinion to be written, a meaningful factual record is indispensable.[16] No such record pres-

16. We do not imply that an equal protection question *never* could be answered properly in an advisory opinion. We simply state that the obvious need for fact-finding, which *this* case presents, makes resolution through the advisory opinion mechanism particularly inappropriate.

It is noteworthy that the decision of the United States Supreme Court in *Fitzgerald v.*

*Racing Association of Central Iowa*, 539 U.S. 103, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) and that of the Supreme Court of Iowa in *Racing Association of Central Iowa v. Fitzgerald*, 675 N.W.2d 1 (Iowa 2004) both were decided in the context of a litigated case in which fact-finding had occurred.

ently exists, and we are precluded from conducting fact-finding in the advisory opinion context. Accordingly, we respectfully decline to answer the questions concerning the constitutionality of the proposed legislation in light of either the federal or the state constitutional equal protection guarantees.

■ It has long been the understanding of this Court that it should not issue advisory opinions in contexts in which fact-finding is required. *See In re Advisory Opinion to the Governor (Rhode Island Ethics Commission—Separation of Powers)*, 732 A.2d 55, 72 (R.I.1999) ("[T]his Court will not issue advisory opinions which require a direct or indirect exercise of our fact-finding power."); *Advisory Opinion to the Governor*, 113 R.I. 586, 597, 324 A.2d 641, 647 (1974) ("It is settled that, in giving advisory opinions under amend. XII, sec. 2, of the constitution, this court will not give opinions which require, directly or indirectly, an exercise of the factfinding power of the court."); *Opinion to the Governor*, 96 R.I. 358, 364, 191 A.2d 611, 614–15 (1963) (stating the fact-finding "power inheres in the court as the judicial branch of the state government, and * * * may not be exercised by judges when acting as individuals pursuant to the provisions of sec. 2 of art. XII of amendments."); *see also In re Request for Advisory Opinion from the Governor (Warwick Station Project)*, 812 A.2d 789, 790 (R.I.2002); *In re Request for Advisory Opinion Regarding House Bill 83–H–5640*, 472 A.2d 301, 302 (R.I.1984).

We find pertinent the observation of Justice Frankfurter in *United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547,

5 L.Ed.2d 476 (1961), to the effect that the United States Supreme Court consistently has refused to give advisory opinions because such opinions are "advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests * * *." [17] We quote these words of Justice Frankfurter to explain that, in declining to answer the questions relative to equal protection in this case, we are not acting in derogation of our constitutional duty to render advisory opinions—but rather we simply are yielding to the reality that from time to time there are issues which, because of a lack of fact-finding, remain "unfocused" and do not present "clear concreteness" to the Court. *Id.* This is just such a case.

For these reasons, we respectfully decline to respond to questions 3 and 4 set forth in your request for an advisory opinion.

### Conclusion

For the reasons stated, we answer the first question submitted to us by the honorable members of the House of Representatives in the negative, the second question in the affirmative, and we decline to answer the third and fourth questions. In concluding our analysis, we wish to thank the parties and amici curiae for their helpful and often insightful briefing of the pertinent legal issues.

Respectfully submitted,

17. We are aware that, unlike this Court, the federal courts are precluded by the "case or controversy" language in Article III of the United States Constitution from rendering advisory opinions. Nevertheless, the quoted language from Justice Frankfurter's opinion in *Fruehauf* cogently summarizes our view about why we think it inappropriate to render an advisory opinion with respect to the equal protection issues in this case.

Chief Justice Frank J. Williams

Justice Paul A. Suttell

Justice William P. Robinson III

Justices GOLDBERG and FLAHERTY did not participate.